# UNITED STATES *v.* LOEW'S INCORPORATED
## ET AL.

No. 42.   Argued October 16, 1962.—Decided November 5, 1962.*

---

*Together with No. 43, *Loew's Incorporated et al.* v. *United States,* and No. 44, *C & C Super Corp.* v. *United States,* also on appeals from the same Court.

*Daniel M. Friedman* argued the cause for the United States. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Loevinger, Lionel Kestenbaum* and *Richard A. Solomon.*

*Louis Nizer* argued the cause for Loew's Incorporated et al., appellees in No. 42 and appellants in No. 43. With him on the briefs was *Benjamin Melniker.*

*Myles J. Lane* argued the cause and filed briefs for Screen Gems, Inc., appellee in No. 42 and appellant in No. 43. With him on the briefs was *Everett A. Frohlich.*

*Mervin C. Pollak* argued the cause and filed briefs for C & C Super Corp., appellee in No. 42 and appellant in No. 44.

*Justin M. Golenbock* argued the cause for National Telefilm Associates, Inc., appellee in No. 42. With him on the brief were *Russell S. Knapp* and *Seymour Shainswit.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

These consolidated appeals present as a key question the validity under § 1 of the Sherman Act [1] of block booking of copyrighted feature motion pictures for television exhibition. We hold that the tying agreements here are illegal and in violation of the Act.

---

[1] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 26 Stat. 209 (1890), as amended, 15 U. S. C. § 1.

The United States brought separate civil antitrust actions in the Southern District of New York in 1957 against six major distributors of pre-1948 copyrighted motion picture feature films for television exhibition, alleging that each defendant had engaged in block booking in violation of § 1 of the Sherman Act. The complaints asserted that the defendants had, in selling to television stations, conditioned the license or sale of one or more feature films upon the acceptance by the station of a package or block containing one or more unwanted or inferior films. No combination or conspiracy among the distributors was alleged; nor was any monopolization or attempt to monopolize under § 2 of the Sherman Act averred. The sole claim of illegality rested on the manner in which each defendant had marketed its product. The successful pressure applied to television station customers to accept inferior films along with desirable pictures was the gravamen of the complaint.

After a lengthy consolidated trial, the district judge filed exhaustive findings of fact, conclusions of law, and a carefully reasoned opinion, 189 F. Supp. 373, in which he found that the actions of the defendants constituted violations of § 1 of the Sherman Act. The conclusional finding of fact and law was that

> ". . . the several defendants have each, from time to time and to the extent set forth in the specific findings of fact, licensed or offered to license one or more feature films to television stations on condition that the licensee also license one or more other such feature films, and have, from time to time and to the extent set forth in the specific findings of fact, refused, expressly or impliedly, to license feature films to television stations unless one or more other such feature films were accepted by the licensee." 189 F. Supp., at 397–398.

The judge recognized that there was keen competition between the defendant distributors, and therefore rested his conclusion solely on the individual behavior of each in engaging in block booking. In reaching his decision he carefully considered the evidence relating to each of the 68 licensing agreements that the Government had contended involved block booking. He concluded that only 25 of the contracts were illegally entered into. Nine of these belonged to defendant C & C Super Corp., which had an admitted policy of insisting on block booking that it sought to justify on special grounds.

Of the others, defendant Loew's, Incorporated, had in two negotiations that resulted in licensing agreements declined to furnish stations KWTV of Oklahoma City and WBRE of Wilkes-Barre with individual film prices and had refused their requests for permission to select among the films in the groups. Loew's exacted from KWTV a contract for the entire Loew's library of 723 films, involving payments of $314,725.20. The WBRE agreement was for a block of 100 films, payments to total $15,000.

Defendant Screen Gems, Inc., was also found to have block booked two contracts, both with WTOP of Washington, D. C., one calling for a package of 26 films and payments of $20,800 and the other for 52 films and payments of $40,000. The judge accepted the testimony of station officials that they had requested the right to select films and that their requests were refused.

Associated Artists Productions, Inc., negotiated four contracts that were found to be block booked. Station WTOP was to pay $118,800 for the license of 99 pictures, which were divided into three groups of 33 films, based on differences in quality. To get "Treasure of the Sierra Madre," "Casablanca," "Johnny Belinda," "Sergeant York," and "The Man Who Came to Dinner," among others, WTOP also had to take such films as "Nancy Drew

Troubleshooter," "Tugboat Annie Sails Again," "Kid Nightingale," "Gorilla Man," and "Tear Gas Squad." A similar contract for 100 pictures, involving a license fee of $140,000, was entered into by WMAR of Baltimore. Triangle Publications, owner and operator of five stations, was refused the right to select among Associated's packages, and ultimately purchased the entire library of 754 films for a price of $2,262,000 plus 10% of gross receipts. Station WJAR of Providence, which licensed a package of 58 features for a fee of $25,230, had asked first if certain films it considered undesirable could be dropped from the offered packages and was told that the packages could not be split.

Defendant National Telefilm Associates was found to have entered into five block booked contracts. Station WMAR wanted only 10 Selznick films, but was told that it could not have them unless it also bought 24 inferior films from the "TNT" package and 12 unwanted "Fabulous 40's." It bought all of these, for a total of $62,240. Station WBRE, before buying the "Fox 52" package in its entirety for $7,358.50, requested and was refused the right to eliminate undesirable features. Station WWLP of Springfield, Massachusetts, inquired about the possibility of splitting two of the packages, was told this was not possible, and then bought a total of 59 films in two packages for $8,850. A full package contract for National's "Rocket 86" group of 86 films was entered into by KPIX of San Francisco, payments to total $232,200, after KPIX requested and was denied permission to eliminate undesirable films from the package. Station WJAR wanted to drop 10 or 12 British films from this defendant's "Champagne 58" package, was told that none could be deleted, and then bought the block for $31,000.

The judge found that defendant United Artists Corporation had in three consummated negotiations conditioned the sale of films on the purchase of an entire

package. The "Top 39" were licensed by WAAM of Baltimore for $40,000 only after receipt of a refusal to sell 13 of the 39 films in the package. Station WHTN of Huntington, West Virginia, purchased "Award 52" for $16,900 after United Artists refused to deal on any basis other than purchase of the entire 52 films. Thirty-nine films were purchased by WWLP for $5,850 after an initial inquiry about selection of titles was refused.

Since defendant C & C was found to have had an over-all policy of block booking, the court did not analyze the particular circumstances of the nine negotiations which had resulted in the licensing of packages of films. C & C's policies resulted in at least one station having to take a package in which "certain of the films were unplayable since they had a foreign language sound track." 189 F. Supp., at 389.

The court entered separate final judgments against the defendants, wherein each was enjoined from

"(A) Conditioning or tying, or attempting to condition or tie, the purchase or license of the right to exhibit any feature film over any television station upon the purchase or license of any other film;

"(B) Conditioning the purchase or license of the right to exhibit any feature film over any television station upon the purchase or license for exhibition over any other television station of that feature film, or any other film;

"(C) Entering into any agreement to sell or license the right to exhibit any feature film over any tele-vision station in which the differential between the price or fee for such feature film when sold or licensed alone and the price or fee for the same film when sold or licensed with one or more other film [sic] has the effect of conditioning the sale or license of such film upon the sale or license of one or more other films."

All of the defendants except National Telefilm [2] appeal from the decree. The appeals of defendants Loew's, Screen Gems, Associated Artists, and United Artists raise identical issues and are consolidated as No. 43. The appeal of defendant C & C raises additional issues, and is therefore separately numbered as No. 44. The Government, although it won on the merits below, asserts in a cross-appeal (No. 42) that the scope and specificity of the decree entered by the District Court were inadequate to prevent the continued attainment of illegal objectives. It seeks to have the decree broadened in a number of ways. All of the defendants below oppose these modifications. The cases are here on direct appeal from the District Court under § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. We noted probable jurisdiction, 368 U. S. 973, and consolidated the appeals. We shall consider No. 43 first, since appellants there raise the fundamental question whether their activities were in violation of the antitrust laws. We shall thereafter consider No. 44, the special arguments of appellant C & C, and finally No. 42, the Government's request for broadening the decree.

## I.

This case raises the recurring question of whether specific tying arrangements violate § 1 of the Sherman Act.[3] This Court has recognized that "[t]ying agreements serve hardly any purpose beyond the suppression of competition," *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305–306. They are an object of anti-

---

[2] National Telefilm has, however, filed a brief in opposition to the Government's requests for modifications in the decree, discussed below.

[3] See *International Salt Co.* v. *United States,* 332 U. S. 392; *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131; *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594; *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1.

trust concern for two reasons—they may force buyers into giving up the purchase of substitutes for the tied product, see *Times-Picayune Pub. Co. v. United States,* 345 U. S. 594, 605, and they may destroy the free access of competing suppliers of the tied product to the consuming market, see *International Salt Co. v. United States,* 332 U. S. 392, 396. A tie-in contract may have one or both of these undesirable effects when the seller, by virtue of his position in the market for the tying product, has economic leverage sufficient to induce his customers to take the tied product along with the tying item. The standard of illegality is that the seller must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . ." *Northern Pacific R. Co. v. United States,* 356 U. S. 1, 6. Market dominance—some power to control price and to exclude competition—is by no means the only test of whether the seller has the requisite economic power. Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.[4]

The requisite economic power is presumed when the tying product is patented or copyrighted, *International Salt Co. v. United States,* 332 U. S. 392; *United States*

---

[4] Since the requisite economic power may be found on the basis of either uniqueness or consumer appeal, and since market dominance in the present context does not necessitate a demonstration of market power in the sense of § 2 of the Sherman Act, it should seldom be necessary in a tie-in sale case to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product and into the corollary problem of the seller's percentage share in that market. This is even more obviously true when the tying product is patented or copyrighted, in which case, as appears in greater detail below, sufficiency of economic power is presumed. Appellants' reliance on *United States v. E. I. du Pont de Nemours & Co.,* 351 U. S. 377, is therefore misplaced.

v. *Paramount Pictures, Inc.,* 334 U. S. 131. This principle grew out of a long line of patent cases which had eventuated in the doctrine that a patentee who utilized tying arrangements would be denied all relief against infringements of his patent. *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502; *Carbice Corp.* v. *American Patents Dev. Corp.,* 283 U. S. 27; *Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436; *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488; *Mercoid Corp.* v. *Mid-Continent Investment Co.,* 320 U. S. 661. These cases reflect a hostility to use of the statutorily granted patent monopoly to extend the patentee's economic control to unpatented products. The patentee is protected as to his invention, but may not use his patent rights to exact tribute for other articles.

Since one of the objectives of the patent laws is to reward uniqueness, the principle of these cases was carried over into antitrust law on the theory that the existence of a valid patent on the tying product, without more, establishes a distinctiveness sufficient to conclude that any tying arrangement involving the patented product would have anticompetitive consequences. *E. g., International Salt Co.* v. *United States,* 332 U. S. 392. In *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 156–159, the principle of the patent cases was applied to copyrighted feature films which had been block booked into movie theaters. The Court reasoned that

> "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. In *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 127, Chief Justice Hughes spoke as follows respecting the copyright monopoly granted by Congress, 'The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits

derived by the public from the labors of authors.' It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright. Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even where all the films included in the package are of equal quality, the requirement that all be taken if one is desired increases the market for some. Each stands not on its own footing but in whole or in part on the appeal which another film may have. As the District Court said, the result is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses." 334 U. S., at 158.

Appellants attempt to distinguish the *Paramount* decision in its relation to the present facts: the block booked sale of copyrighted feature films to exhibitors in a new medium—television. Not challenging the District Court's finding that they did engage in block booking, they contend that the uniqueness attributable to a copyrighted feature film, though relevant in the movie-theater context, is lost when the film is being sold for television use. Feature films, they point out, constitute less than 8% of television programming, and they assert that films are "reasonably interchangeable" with other types of programming material and with other feature films as well. Thus they argue that their behavior is not to be judged by the principle of the patent cases, as applied to copyrighted materials in *Paramount Pictures,* but by the gen-

eral principles which govern the validity of tying arrangements of nonpatented products, *e. g., Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 6, 11. They say that the Government's proof did not establish their "sufficient economic power" in the sense contemplated for nonpatented products.[5]

Appellants cannot escape the applicability of *Paramount Pictures.* A copyrighted feature film does not lose its legal or economic uniqueness because it is shown on a television rather than a movie screen.

The district judge found that each copyrighted film block booked by appellants for television use "was in itself a unique product"; that feature films "varied in theme, in artistic performance, in stars, in audience appeal, etc.," and were not fungible; and that since each defendant by reason of its copyright had a "monopolistic" position as to each tying product, "sufficient economic power" to impose an appreciable restraint on free competition in the tied product was present, as demanded by the *Northern Pacific* decision. 189 F. Supp., at 381.[6] We agree. These findings of the district judge, supported by the record, confirm the presumption of uniqueness resulting from the existence of the copyright itself.

Moreover, there can be no question in this case of the adverse effects on free competition resulting from appel-

---

[5] Appellants' framing of their argument in terms of each of them not having dominance in the market for television exhibition of feature films misconceives the applicable legal standard. As noted, *supra,* p. 45, "sufficient economic power" as contemplated by the *Northern Pacific* case is a term more inclusive in scope than "market dominance."

[6] To use the trial court's apt example, forcing a television station which wants "Gone With The Wind" to take "Getting Gertie's Garter" as well is taking undue advantage of the fact that to television as well as motion picture viewers there is but one "Gone With The Wind."

lants' illegal block booking contracts. Television stations forced by appellants to take unwanted films were denied access to films marketed by other distributors who, in turn, were foreclosed from selling to the stations. Nor can there be any question as to the substantiality of the commerce involved. The 25 contracts found to have been illegally block booked involved payments to appellants ranging from $60,800 in the case of Screen Gems to over $2,500,000 in the case of Associated Artists. A substantial portion of the licensing fees represented the cost of the inferior films which the stations were required to accept. These anti-competitive consequences are an apt illustration of the reasons underlying our recognition that the mere presence of competing substitutes for the tying product, here taking the form of other programming material as well as other feature films, is insufficient to destroy the legal, and indeed the economic, distinctiveness of the copyrighted product. *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 307; *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594, 611 and n. 30. By the same token, the distinctiveness of the copyrighted tied product is not inconsistent with the fact of competition, in the form of other programming material and other films, which is suppressed by the tying arrangements.

It is therefore clear that the tying arrangements here both by their "inherent nature" and by their "effect" injuriously restrained trade. *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179. Accommodation between the statutorily dispensed monopoly in the combination of contents in the patented or copyrighted product and the statutory principles of free competition demands that extension of the patent or copyright monopoly by the use of tying agreements be strictly confined. There may be rare circumstances in which the doctrine we have enunciated under § 1 of the Sherman Act prohibiting tying arrangements involving patented or copyrighted

tying products is inapplicable. However, we find it difficult to conceive of such a case, and the present case is clearly not one.

The principles underlying our *Paramount Pictures* decision have general application to tying arrangements involving copyrighted products, and govern here. Applicability of *Paramount Pictures* brings with it a meeting of the test of *Northern Pacific,* since *Paramount Pictures* is but a particularized application of the general doctrine as reaffirmed in *Northern Pacific.* Enforced block booking of films is a vice in both the motion picture and television industries, and that the sin is more serious (in dollar amount) in one than the other does not expiate the guilt for either. Appellants' block booked contracts are covered by the flat holding in *Paramount Pictures,* 334 U. S., at 159, that "a refusal to license one or more copyrights unless another copyright is accepted" is "illegal."

Appellants (other than C & C) make the additional argument that each of them was found to have entered into such a small number of illegal contracts as to make it improper to enter injunctive relief. Appellants urge that their over-all sales policies were to allow selective purchasing of films, and that in light of this, the fact that a few contracts were found to be illegal does not justify the entering of injunctive relief. We disagree. Illegality having been properly found, appellants cannot now complain that its incidence was too scattered to warrant injunctive relief. The trial judge, exercising sound judgment, has concluded that injunctive relief is necessary to prevent further violations. We think that finding wholly warranted. Moreover, the record shows that Loew's only instituted its policy of making individual films available shortly after suit was brought, and there is evidence that United Artists was conscientious in publicizing its will-

ingness to deal in individual films only after the commencement of suit was imminent. There is no reason to disturb the judge's legal conclusions and decree merely because he did not find more illegal agreements when, as here, the illegal behavior of each defendant had substantial anticompetitive effects.

## II.

Appellant C & C in its separate appeal raises certain arguments which amount to an attempted business justification for its admitted block booking policy. C & C purchased the telecasting rights in some 742 films known as the "RKO Library." It did so with a bank loan for the total purchase price, and to get the bank loan it needed a guarantor, which it found in the International Latex Corporation. Latex, however, demanded and secured an agreement from C & C that films would not be sold without obtaining in return a commitment from television stations to show a minimum number of Latex spot advertisements in conjunction with the films. Thus, since stations could not feasibly telecast the minimum number of spots without buying a large number of films to spread them over, C & C by requiring the minimum number of advertisements effectively forced block booking on those stations which purchased its films. C & C contends the block booking was merely the by-product of two legitimate business motives—Latex' desire for a saturation advertising campaign, and C & C's wish to buy a large film library. However, the obvious answer to this contention is that the thrust of the antitrust laws cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the antitrust laws could be nullified. Contractual obligations cannot thus supersede statutory imperatives. Hence, tying arrangements, once found to exist in a con-

text of sufficient economic power, are illegal "without elaborate inquiry as to . . . the business excuse for their use," *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5.

In Nos. 43 and 44, therefore, we agree with the merits of the District Court's decision. It correctly found that the conditioning of the sale of one or more copyrighted feature films to television stations upon the purchase of one or more other films is illegal. The antitrust laws do not permit a compounding of the statutorily conferred monopoly.

## III.

The trial judge's ability to formulate a decree tailored to deal with the violations existent in each case is normally superior to that of any reviewing court, due to his familiarity with testimony and exhibits. Notwithstanding our belief that primary responsibility for the decree must rest with the trial judge if workable results are to obtain, it is our duty to examine the decree in light of the record to see that the relief it affords is adequate to prevent the recurrence of the illegality which brought on the given litigation. *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 89.

The United States contends that the relief afforded by the final judgments [7] is inadequate and that to be adequate it must also: (1) require the defendants to price the films individually and offer them on a picture-by-picture basis; (2) prohibit noncost-justified differentials in price between a film when sold individually and when sold as part of a package; (3) proscribe "temporary" refusals by a distributor to deal on less than a block basis while he is negotiating with a competing television station for a package sale.

[7] The operative portion of the injunctions appears at p. 43, *supra.*

Some of the practices which the Government seeks to have enjoined with its requested modifications are acts which may be entirely proper when viewed alone. To ensure, however, that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461; *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, 724; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 409; *International Salt Co.* v. *United States,* 332 U. S. 392, 401; *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 88–89. When the Government has won the lawsuit, it is entitled to win the cause as well, *International Salt Co.* v. *United States, supra,* 332 U. S., at 401.

### A. *Initial Offer of Individual Films, Individually Priced.*

Under the final judgments entered by the court, a distributor would be free to offer films in a package initially, without stating individual prices. If, however, he delayed at all in producing individual prices upon request, he would subject himself to a possible contempt sanction. The Government's first request would prevent this "first bite" possibility, forcing the offer of the films on an individual basis at the outset (but, as we view it, not precluding a simultaneous package offer, *United States* v. *Paramount Pictures, Inc., supra,* 334 U. S., at 159).

This is a necessary addition to the decrees, in view of the evidence appearing in the record. Television stations which asked for the individual prices of some of the better pictures "couldn't get any sort of a firm kind of an answer," according to one station official. He stated that they received a "certain form of equivocation, like the price for the better pictures that we wanted was so high that it wouldn't be worth our while to discuss the mat-

ter, . . . the implication being that it wouldn't happen." A Screen Gems intracompany memorandum about a Baton Rouge station's price request stated that "I told him that I would be happy to talk to him about it, figuring we could start the old round robin that worked so well in Houston & San Antonio." Without the proposed amendment to the decree, distributors might surreptitiously violate it by allowing or directing their salesmen to be reluctant to produce the individual price list on request. This subtler form of sales pressure, though not accompanied by any observable delay over time, might well result in some television stations buying the block rather than trying to talk the seller into negotiating on an individual basis. Requiring the production of the individual list on first approach will obviate this danger.

### B. *Prohibition of Noncost-justified Price Differentials.*

The final judgments as entered only prohibit a price differential between a film offered individually and as part of a package which "has the effect of conditioning the sale or license of such film upon the sale or license of one or more other films." The Government contends that this provision appearing by itself is too vague and will lead to unnecessary litigation. Differentials unjustified by cost savings may already be prohibited under the decree as it now appears. Nevertheless, the addition of a specific provision to prevent such differentials will prevent uncertainty in the operation of the decree. To ensure that litigation over the scope and application of the decrees is not left until a contempt proceeding is brought, the second requested modification should be added. The Government, however, seeks to make distribution costs the only saving which can legitimately be the basis of a discount. We would not so limit the relevant cost justifications. To prevent definitional arguments, and to ensure

that all proper bases of quantity discount may be used, the modification should be worded in terms of allowing all legitimate cost justifications.

## C. *Prohibition of "Temporary" Refusals to Deal.*

The Government's third request is, like the first, designed to prevent distributors from subjecting prospective purchasers to a "run-around" on the purchase of individual films. No doubt temporary refusal to sell in broken lots to one customer while negotiating to sell the entire block to another is a proper business practice, viewed *in vacuo,* but we think that if permitted here it may tend to force some stations into buying pre-set packages to forestall a competitor's getting the entire group. In recognition of this the Government seeks a blanket prohibition against all temporary refusals to deal. We agree in the main, except that the modification proposed by the Government fails to give full recognition to that part of this Court's holding in *Paramount Pictures* which said,

> "We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted." 334 U. S., at 159.

We therefore grant the Government's request, but modify it only to the limited degree necessary to permit a seller briefly to defer licensing or selling to a customer pending the expeditious conclusion of bona fide negotiations already being conducted with a competing station on a proposal wherein the distributor has simultaneously offered to license or sell films either individually or in a package.

The modifications we have specified will bring about a greater precision in the operation of the decrees. We

have concluded that they will properly protect the interest of the Government in guarding against violations and the interest of the defendants in seeking in good faith to comply.

The judgments are vacated and the causes are remanded to the District Court for further proceedings in conformity with this opinion.

*Vacated and remanded.*

MR. JUSTICE HARLAN, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

I agree with and join in Parts I and II of the Court's opinion, relating to No. 43 and No. 44, respectively. As to Part III, relating to No. 42, I dissent. My disagreement goes not so much to the particular additional relief granted, but to the fact that the Court has deemed it appropriate to concern itself at all with such comparatively trivial remedial glosses upon the District Court's decree.

I think it distorts the proper relationship of this Court to the lower federal courts, whose assessment of a particular situation is bound to be more informed than ours, for us to exercise revisory power over the terms of antitrust relief, except in instances where things have manifestly gone awry. This is not such a case, as the meticulous handling of it by the District Court abundantly shows. In my view its decree should be left undisturbed.