**UNITED STATES of America, Plaintiff,**

v.

**COLUMBIA BROADCASTING SYSTEM, INC., Defendant.**

United States District Court
S. D. New York.

March 4, 1963.

Bernard M. Hollander, Jennie M. Crowley, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Rosenman, Colin, Kaye, Petschek & Freund, New York City, for defendant, Samuel I. Rosenman, Seymour D. Lewis, Asa D. Sokolow, Gilbert S. Edelson, Thomas K. Fisher, Richard A. Forsling, New York City, Leon R. Brooks, Washington, D. C., of counsel.

WEINFELD, District Judge.

The Government moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in this action wherein the defendant, also referred to hereafter as CBS, which operates a national television network, is charged with violation of section 1 of the Sherman Act.[1] The motion for final judgment without a trial rests upon the complaint, the answer, the statement of the material facts as to which the Government contends there is no genuine issue,[2] and the exhibits. The Government's claim that the matter is ripe for summary judgment disposition draws a sharp challenge from the defendant, which contends that many substantial issues of fact are in dispute and require a trial.

The charge of antitrust violation centers about a change in the method and rate of compensating local stations affiliated with the defendant's national

---

1. 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1958).

2. Rule 9 of the General Rules of this Court.

network for the broadcast of its programs. Prior to January, 1961, most of the defendant's 197 affiliated stations operated under a so-called standard agreement which in substance provided for compensation to the affiliate at the flat rate of thirty per cent of the gross charges to advertisers for each converted hour [3] of CBS network time cleared [4] over the affiliate station, less five converted hours per week for which the affiliate was not compensated. However, beginning in January, 1961, and thereafter, CBS entered into agreements with forty-one of its affiliates which provided for a different method and rate of compensation—a sliding scale referred to as the 10–60% plan.[5] In broad outline, this new plan provides for compensation to the affiliate for clearances at the rate of ten per cent of the weekly charges by CBS to advertisers for the first sixty per cent of all converted hours requested of, and cleared by, the station and above that level at the rate of sixty per cent for each additional converted hour.[6]

The essence of the Government's charge is that the new compensation plan is illegal per se; that in end result the agreements are contracts in unreasonable restraint of interstate commerce in the production, distribution and sale of television programs. The Goverment contends that the main thrust of the plan, with its lower rate of compensation up to the sixty per cent level of converted hours cleared and the higher rate for hours thereafter, is the application of economic leverage upon an affiliate by penalizing it if it does not clear the bulk of CBS programs. It charges that the plan was designed by the defendant with the specific intent to induce or coerce its affiliates to accept virtually all their requirements from the defendant, thereby restraining the affiliates' freedom in the selection of individual programs on their individual merits and foreclosing access to the affiliates by competing networks, independent program suppliers, non-network national advertisers and local advertisers. In final result the Government argues that the 10–60% formula creates a tying arrangement and establishes block booking of CBS programs, since to attain the same average rate of compensation per converted hour as it previously received under the "standard rate" the station now must clear all but an hour of the network schedule offered by CBS, thereby eliminating independent programs which previously have been carried.

To buttress its argument that the inevitable result of the contracts is to compel acceptance by the affiliate of practically all programs proffered by CBS, the Government stresses the "option time" provisions [7] contained in most of the contracts, the new and the old.[8] These provide for option time to the network of two and a half hours in the afternoon and two and a half hours in the evening, but are subject to certain conditions permitting non-clearance by the affiliate, on the importance of which the parties disagree. Here the Government contends that by reason of the option

---

3. A "converted hour" differs from a clock hour. A converted hour is CBS network clock time adjusted for differences in the value of the various time segments of the broadcast day dependent upon its desirability. For example, a converted hour is the equivalent of a prime evening clock hour or two afternoon clock hours.

4. A station is cleared when it makes time available for the broadcast of a network program.

5. Pending appeal from a ruling by the Federal Communications Commission, the defendant has refrained from entering into the new type agreement with its other affiliates.

6. There are two basic forms of the new arrangement with variations within the two groups. It is not necessary for the purposes of this motion to consider the differences.

7. In substance "option time" gives the network a first call on the affiliate in specified time periods of its daily broadcast time.

8. Thirty-nine of the 197 affiliation contracts contain no option time provision; of the new plan contracts, four do not contain such a provision.

time provision, at least sixty per cent of the network hours ordered by CBS must be carried by the affiliate for which it receives compensation at the rate of only ten per cent, thereby compelling the affiliate to accept the balance of the offered programs in order to get the higher rate. Finally, the Government urges that the papers demonstrate other essential elements to establish its claim, such as the defendant's economic power, uniqueness of each television program, and that the commerce restrained by the new agreement is substantial.

The Government's position that the agreements are illegal per se as unreasonable restraints of trade, of course, asserts the ultimate conclusion of law, and to sustain it on this motion the evidential support therefor must come from within the four corners of the agreements or from undisputed facts. The agreements on their face contain no tying provision, nor do they provide for block booking of programs. No clause provides that affiliation is contingent upon the station's agreement to take all offered afternoon or evening CBS programs. Whatever the relative significance of the option time exceptions, it is clear that under the contract an affiliate is free to refuse clearance to CBS programs during option time for any one of a number of specified reasons. The agreement itself does not foreclose CBS network competitors, non-network program suppliers, or national spot and local advertisers from access to and clearance of the very time included in the network schedule offered by CBS. But, as we have seen, the Government's answer is that form must yield to substance, that we live in a work-a-day world, and that the intended and practical effect of the 10–60% provision is the same as if the agreement contained an express requirement for a minimum number of clearances or specifically provided for tying arrangements.

CBS denies that the practical effect of the plan is, or that its purpose was, to restrain CBS affiliates from freedom of action in the selection of non-CBS sources for programs on their individual merits. It asserts, without evidential challenge by the Government, that the affiliates operating under the new plan continue to reject substantially the same number of CBS programs as under the prior compensation agreement. It denies the Government's premise that under the new agreement each affiliate must accept virtually all programs offered by CBS in order to achieve the same average rate of compensation as under the standard agreement and cites statistics and examples in support. It asserts that under the new arrangement a station could refuse to clear four or five converted hours (up to more than ten clock hours) or more of the time ordered each week by CBS and still earn the same average rate of compensation per converted hour cleared as under the former arrangement.[9]

Finally, the defendant denies that the new compensation plan was conceived with the specific intent of restraining trade, but asserts it is an incentive device, designed as a defensive measure against possible serious deterioration of the network's services. It alleges that whereas under the standard contract it compensated the station for clearance time at the rate of thirty per cent across the board (after the five free hours), the stations generally netted sixty per cent for the same time for programs sponsored by national spot and local advertisers and up to fifty-five per cent from other competing national networks, thus placing the defendant at a serious competitive disadvantage. According to the

9. Significantly, as reflecting upon this fact issue, the Government has changed its original estimate of one hour. (Government's main brief, p. 5). In its reply brief it states: "An examination of CBS's list of the 41 agreements reveals that more than half of them require the station to take all but 1½ hours of all CBS programs proffered in order to achieve their previous level of compensation, and 35 of the 41 affiliates must take all but five hours of all CBS programs offered in order to do so." (Government's reply brief, p. 3).

defendant, in recent years this disparate situation resulted in steadily increasing non-clearance of CBS network programs and their replacement by non-network programs or programs of other networks. The defendant states that this has resulted not only in lost time billings of over ten million dollars for a number of years, but has seriously impaired its network position, since nationwide sponsors usually desire the entire complement of affiliate stations. Moreover, it states that the primary source of revenue to the affiliate is not the network, but national spot and local advertisers, and that only about twenty per cent of the total revenue of United States television stations come from networks, the remaining eighty per cent being derived from other sources. Under the circumstances, the defendant asserts that the 10–60% graduated compensation plan is a reasonable and legitimate competitive weapon to meet the challenge posed by the sixty per cent rate offered to affiliates by other suppliers.

Enough has been stated to indicate that the Government's position that the 10–60% arrangement creates and imposes a tying arrangement presents a factual issue, the determination of which must await trial. The cases relied upon by the Government to dispense with a trial of this and other essential issues are readily distinguishable. Thus, in United States v. Paramount Pictures, Inc.,[10] and United States v. Loew's, Inc.,[11] the decrees were entered upon findings of fact based upon evidence taken during extensive trials. And while it is true that in Northern Pac. Ry. v. United States,[12] summary judgment was granted upon a tying arrangement claim, it was based upon a full record which included pretrial depositions and answers to interrogatories. Moreover, the very agreements contained the restrictive provisions.

Here there is no such clause in the agreements and the Government perforce relies upon inferences that the method of payment necessarily encompasses a tying arrangement. As indicated, CBS denies it has such effect.

The Supreme Court in the Northern Pacific case noted:

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed."[13]

The Government, upon a trial, may well be able to establish its claim that the impact of the new compensation provision results in a tying arrangement or block booking and brings the agreement within the above proscription. But the inferences drawn by Government counsel from the bare allegations of the complaint and exhibits annexed, as opposed to the affidavits submitted by the defendant, are insufficient to establish the Government's charge and to avoid a trial. In short, upon the papers here presented, "the case has not met the *per se* criteria of Sherman Act § 1 from which proscribed effect automatically must be inferred."[14]

The conclusion reached by the Court makes it unnecessary to consider the defense position that the case bristles with other disputed issues of fact, such as "economic power" and "market domination." Neither is it necessary to discuss whether the Government has misconceived the basic relationship between the network and its affiliates, as CBS con-

10. 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

11. 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

12. 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

13. 356 U.S. at 5, 78 S.Ct. at 518.

14. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 622, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953).

tends. Contrary to the Government's view, CBS denies it sells its programs to an affiliate and asserts that it buys from an affiliate "clearance" or time—the use of the affiliate's broadcasting facilities so that advertisers' programs may be shown on a national hookup at one time. As a buyer, the argument goes, it cannot be charged with a tying arrangement.

The motion for summary judgment is denied.