[No. 3002–3.   Division Three.   November 13, 1979.]

LESLIE V. SMITH, ET AL, *Appellants,* v. GALLAND AND ASSOCIATES, INC., ET AL, *Respondents.*

*Jerry T. Dyreson* and *Dyreson, Ledlin & Dellwo,* for appellants.

*Howard Stewart,* pro se, *Martin G. Weber, Lukins & Annis, Frank J. Gebhardt, Gebhardt, Looney & Sherrick,* and *Fay H. Oakes,* for respondents.

McINTURFF, J.—Mr. and Mrs. Smith appeal the dismissal of their lawsuit against the defendants, Galland and Associates, et al, which arose out of two separate real estate transactions.

On May 7, 1973, Mr. and Mrs. Smith entered into an earnest money agreement for the purchase of an unimproved lot from the defendant–owner, Mr. Galland, who is also the broker for Galland and Associates, Inc. (Galland), a real estate brokerage company. The lot is located in a Galland development known as the South Meadows Addition. The earnest money agreement was prepared by defendant Michael McKee, a salesman with Galland, and provided in part:

Purchaser agrees to pay Galland and Associates realtors a *commission of 6% of the value of the residence built on*

*Lot 1 Block 3 South Meadows Addition as determined by purchasers mortgagee.* Purchaser also agrees to begin construction within two years of the date of this agreement, complete construction within one year of commencing and abide by all covenants of the subdivision.

(Italics ours.)

Originally Mr. and Mrs. Smith planned to install a prefabricated home on the newly purchased lot. Because this type of home was more expensive than originally anticipated, Mr. Smith subsequently contacted Galland in an attempt to secure a waiver of the 6 percent real estate commission contained in the May 7 earnest money agreement. Galland agreed to waive the commission in exchange for a listing on the Smiths' personal residence, which the Smiths had previously determined to sell. Galland's sales person, defendant Carol Smith, executed the listing agreement, and the Smiths' home was later sold through the multiple listing service.

Thereafter, Mr. and Mrs. Smith began planning for the construction of a new home on the South Meadows Addition lot. To that end, defendant Carol Smith contacted another Galland sales person, defendant Linda Hartfield, and a meeting was arranged in which the Smiths were introduced to the defendant–builder Howard Stewart.

After discussing various construction plans and cost estimates, the Smiths signed a second earnest money agreement which set forth the terms for the construction of a custom–built home by Mr. Stewart. The earnest money agreement, dated January 21, 1975, was prepared or "brokered" by Galland sales agent, Carol Smith. Under the terms of this agreement, Mr. Stewart, the builder, agreed to pay Galland a 6 percent real estate commission based upon the value of the custom–built home. This commission arrangement is to be distinguished from the one contained in the May 7, 1973, earnest money agreement signed by the Smiths.

During the course of construction, Mr. Stewart had financial problems with the result that certain subcontractors filed liens against the Smiths' property. The Smiths immediately notified Carol Smith and Linda Hartfield of Galland, who together with Mr. Galland, contacted Community Savings & Loan Association. Community Savings & Loan Association, in conjunction with Galland, then negotiated with the lien claimants, and thereafter the bank began making disbursements directly to the construction creditors.

Upon completion of construction, however, further financial concessions were necessary in order for the Smiths to take possession of their new home: Galland waived the 6 percent commission due from Mr. Stewart and, due to cost overruns, the Smiths were required to pay an additional $2,025.28 above the contract price. As a part of the same transaction, the Smiths secured a personal note from Mr. Stewart for the same amount. Due to Mr. Stewart's subsequent bankruptcy, however, the Smiths were unable to collect on the note. The Smiths then commenced this action against Galland, alleging fraud, misrepresentation, breach of fiduciary duty and violation of the Consumer Protection Act.

Following a trial, the Smiths' complaint was dismissed with prejudice. While sympathetic with the Smiths' position, the court could find no wrongdoing on the part of the various realtors and concluded responsibility for the Smiths' losses were ultimately attributable to the builder, Mr. Stewart, who had been dismissed from the action as a result of bankruptcy.

## PURCHASE OF THE UNIMPROVED LOT

Directing our attention to the earnest money provision calling for the payment of a 6 percent commission based upon the value of the home to be built on the South Meadows Addition lot, the Smiths charge Galland with unfair and deceptive practices in violation of the Washington Consumer Protection Act, RCW 19.86.020. First, the

Smiths complain of Galland's failure to disclose the company's overall policy for the payment of real estate commissions by other purchasers at the South Meadows Addition. We find no violation of the Consumer Protection Act.

Mr. Galland, as the developer of the South Meadows Addition, originally planned to sell the development lots to builders for the construction of "spec" or custom–built homes. Thus, when the Smiths first made inquiries regarding the purchase of a lot at South Meadows Addition, they were informed by salesman Michael McKee the unimproved lots were not for sale to the general public. Nevertheless, the Smiths continued to express interest in purchasing a lot and induced Mr. McKee to consult Mr. Galland, the owner, on their behalf. Mr. Galland subsequently agreed to sell the Smiths a lot on the condition they would agree to pay the 6 percent real estate commission in question.

We are not aware of any authority, nor has any been cited, which requires a developer to adopt a uniform policy regarding the sale of individual development lots, or to inform a prospective purchaser of the agreements reached with other purchasers in the same development. As long as the negotiation process is not tainted by fraud, misrepresentation or undue influence, the owner is free to determine the circumstances under which he will agree to sell a lot.

Here, the Smiths were fully informed of the circumstances under which Mr. Galland would agree to sell them a lot. Their decision to accept the seller's terms, including the payment of a 6 percent commission, is reflected in the earnest money agreement signed by them on May 7, 1973. At the time the Smiths purchased their lot, Mr. Galland and Mr. McKee stated it was common practice to include a provision for the payment of a real estate commission similar to the one at issue. Under the circumstances, it cannot be said the 6 percent real estate commission was the product of unfair or deceptive practices, and Galland's failure to inform the Smiths of the commission arrangements

made in sales to other purchasers does not violate the Consumer Protection Act.

■ Next, the Smiths contend they were the victims of an illegal tying arrangement. An illegal tying arrangement is said to exist here on the grounds the sale of the development lot was conditioned upon or tied to the Smiths' agreement to pay a 6 percent real estate commission based upon the value of the home to be built on the unimproved lot. We disagree.

> [A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.

*Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 2 L. Ed. 2d 545, 550, 78 S. Ct. 514 (1958). Judicial hostility toward the tying arrangement was explained by the United States Supreme Court in *Northern Pac. Ry. v. United States, supra* at 6:

> Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305–306. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 606.

(Footnote omitted.) *See also Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 22 L. Ed. 2d 495, 502, 89 S. Ct. 1252 (1969); *United States v. Loew's, Inc.,* 371 U.S. 38, 9 L. Ed. 2d 11, 18–19, 83 S. Ct. 97 (1962).

Although a real estate developer undoubtedly possesses some economic power in connection with the sale of development lots, we do not find the 6 percent commission

arrangement exacted here amounts to an illegal tying arrangement.

> The common core of the adjudicated unlawful tying arrangements is the forced purchase of a *second distinct commodity* with the desired purchase of a dominant "tying" product, resulting in economic harm to competition in the "tied" market.

(Italics ours.) *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 97 L. Ed. 1277, 73 S. Ct. 872, 883 (1953). Here, the real estate commission was a component part of the total sales price and not a separate and distinct product. In addition, we find no appreciable restraint on free competition for the tied product. The real estate commission was assessed on the basis of the value of the home to be built on the lot, and not on the basis of an actual sale of the home itself. There being no sale, the Smiths were not forced to forego a choice between competing real estate companies, vying for a listing to sell their home. Upon similar reasoning, competing real estate companies suffered no economic harm because, again, there being no sale of the home, there was no commission for which they could compete.

Finally, any inherent inequity arising out of this transaction was eliminated when Galland agreed to waive the 6 percent commission in exchange for a listing on the Smiths' personal residence. We say this because the record shows the Smiths had previously determined to sell their home, but the efforts of other real estate companies had been unsuccessful. Galland subsequently sold the Smiths' home through the multiple listing service and the only commission they actually collected resulted from the sale of this home.[1]

---

[1]The Consumer Protection Act is essentially an antitrust act, *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 644 (9th Cir. 1969). Therefore, we note, but do not decide whether a different result might obtain if the broker–developer had tied the sale of a development lot to a builder or individual purchaser upon the latter's agreement to list the home subsequently built on the lot with the same brokerage company.

■ The Smiths attempt to establish certain "per se" violations of the Consumer Protection Act. The test for a per se violation of the Consumer Protection Act is twofold: "(1) is the action illegal, *i.e.*, is it unlawful; and (2) is it against public policy as declared by the legislature or the judiciary?" *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 358, 581 P.2d 1349 (1978); *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 270, 501 P.2d 290 (1972).

Here, the Smiths charge Galland with sales practices prohibited under RCW 18.85.230(4), (5), (13), (25), and (26).[2] However, finding of fact No. 11 states in part: "From all the evidence, the court finds that none of the defendants did anything that was unfair or deceptive or *illegal . . .*" (Italics ours.) Our review of the record confirms this finding. There is no basis for finding a violation under RCW 18.85.230. Thus, the Smiths have failed to prove any illegal actions on the part of Galland. Furthermore, the Smiths have failed to establish this single transaction affected the public interest. *Salois v. Mutual of Omaha Ins. Co., supra* at 358.

---

[2] RCW 18.85.230:

"(4) Making, printing, publishing, distributing, or causing, authorizing, or knowingly permitting the making, printing, publication or distribution of false statements, descriptions or promises of such character as to reasonably induce any person to act thereon, if the statements, descriptions or promises purport to be made or to be performed by either the licensee or his principal and the licensee then knew or, by the exercise of reasonable care and inquiry, could have known, of the falsity of the statements, descriptions or promises;

"(5) Knowingly committing, or being a party to, any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme or device whereby any other person lawfully relies upon the word, representation or conduct of the licensee;

". . .

"(13) Charging or accepting compensation from more than one party in any one transaction without first making full disclosure of all the facts to all the parties interested in the transaction;

". . .

"(25) In the case of a broker licensee, failing to exercise adequate supervision over the activities of his licensed associate brokers and salesmen within the scope of this 1972 amendatory act;

"(26) Any conduct in a real estate transaction which demonstrates bad faith, dishonesty, untrustworthiness or incompetency; or"

Apart from alleged violations of the Consumer Protection Act, the Smiths contend Galland should be required to forfeit the real estate commission arising out of the sale of their personal residence because the listing was procured through deliberate misrepresentation or mistake. We disagree.

The Smiths negotiated for the purchase of the unimproved lot and signed an earnest money agreement in which they agreed to pay the 6 percent commission in question. We find nothing illegal about this term of the sale—it was the parties' contract. Thereafter, the Smiths approached Galland in an attempt to have the commission waived. They raised no question as to their obligation to pay the commission, but sought the waiver in an attempt to "cut corners" in the construction of their new home. Mr. McKee, with the concurrence of Mr. Galland, suggested a waiver of the commission in exchange for a listing on the Smiths' personal residence, which they had previously determined to sell. The Smiths agreed to this modification of their contract, and their home was subsequently sold without incident.

Thus, we find no basis for requiring Galland to forfeit the commission earned on the sale of the Smiths' personal residence. The waiver of the commission in exchange for the listing agreement was the product of negotiation, not mistake. Both parties were fully informed, and there is no evidence that the listing was the product of false representations on the part of Galland.

### NEW HOME CONSTRUCTION

Next, the Smiths contend various actions by Galland in connection with the construction of their custom–built home amounted to a breach of fiduciary duty. First, the Smiths contend Galland failed to disclose that Mr. Stewart, the builder, had agreed to pay Galland a 6 percent commission based upon the value of the custom–built home. We disagree.

Mrs. Smith's testimony indicates defendants Carol Smith and Linda Hartfield mentioned to the Smiths the 6 percent commission agreement which was to be paid by Mr. Stewart.[3] The 6 percent commission arrangement was set forth and acknowledged by Mr. Stewart on the earnest money agreement. In addition, the 6 percent commission was included in the builder's cost estimate sheet which was presented to the Smiths. Finally, we note Galland ultimately waived the commission due from Mr. Stewart in order to effect the closing on the Smiths' new home. Hence, the Smiths sustained no loss at the hands of Galland. Mr. Stewart was responsible for the fact that the commission was passed on to the Smiths as a part of the total cost of their new home.

The Smiths also contend Galland breached its fiduciary duty by failing to disclose information regarding the unsatisfactory financial history of the builder, Mr. Stewart. The Smiths state that had they known of Mr. Stewart's financial background, which included a previous adjudication of bankruptcy, they would not have chosen him as their builder.

From our review of the record, defendants Carol Smith and Linda Hartfield had no information to disclose. Neither sales person had knowledge of Mr. Stewart's previous adjudication in bankruptcy since their acquaintance with him was limited to his apparent excellent reputation as a builder. Nor do we believe the defendants were put on notice of Mr. Stewart's unfavorable financial background. Although Community Savings & Loan Association knew of Mr. Stewart's bankruptcy, it made the interim construction loan to him. They did not convey this information to these defendants.

---

[3]Esther Smith testified:

"Q: Did you—Carol Smith and Linda Hartfield explained to you that this is a commission that Mr. Howard Stewart was to pay to Galland and Associates?

"A: That was mentioned to me."

Finally, the Smiths contend Galland breached their fiduciary duty by failing to take steps to protect the Smiths' interest in their property when subcontractors began filing liens for nonpayment. Again, this argument is not supported by the record. When Galland learned of the problems the Smiths were experiencing, Carol Smith, Linda Hartfield and Mr. Robert Galland contacted the branch manager of Community Savings & Loan Association in an attempt to negotiate with the lien claimants. Galland continued to communicate with the bank and it was eventually agreed the bank would make disbursements directly to the construction creditors. At the time of closing, the Smiths were required to pay an additional $2,025.28 due to cost overruns; however, responsibility for this added expense lies exclusively with the builder, Mr. Stewart. In connection with the construction of the Smiths' custom–built home, the trial court found, and we agree, Galland performed every service that could reasonably be expected of them, including their waiver of the 6 percent commission due from Mr. Stewart.

█ Finally, the Smiths have assigned error, unaccompanied by argument, to finding of fact No. 12:

Michael McKee did not represent to Leslie V. Smith and Esther M. Smith that they would not be required to pay for water and utility hookups to the property.

We find substantial evidence in the record to support the conclusion the defendant Michael McKee made no representations or agreement to assume responsibility for the water and utility hookups.

Judgment of the Superior Court is affirmed.

GREEN, C.J., and ROE, J., concur.