## CIRCUIT COURT OF PRINCE WILLIAM COUNTY

Commonwealth of Virginia

v.

Joseph R. Winslow,
Elm Farm Associates Limited Partnership,
Winslow, Inc.,
Jerry C. Faircloth,
A.A. Mobile Market, Inc.

Case No. (Chancery) 20943

By JUDGE H. SELWYN SMITH

August 6, 1986

I have spent considerable time studying the pleadings and the voluminous memorandum together with attached exhibits and reached these decisions.

The guidelines prepared by the Department of Justice in January of 1985 are, in my opinion, prepared simply as guidelines to assist in the efficient use of the resources of that department in prosecuting federal antitrust cases. They in effect advise the agents and lawyers in the Department of Justice of the types of cases they will prosecute. It is obvious from those guidelines that they do not prosecute all cases.

I have previously ruled that mobile home lots and mobile homes are separate products and are therefore subject to be tied and in this case are in fact tied for the purposes of analysis of our Virginia Antitrust Act.

It is my further opinion that the tying arrangement affects a substantial volume of commerce in the product market in which the defendants operate. I further find that the defendants have a substantial economic power.

Accordingly, it is my opinion that the tying arrangement is, *per se*, illegal. Having made this ruling, it appears to me that the sole remaining issue in the suit is the amount of damages, if any, and against whom they shall be assessed.

### February 20, 1987

The Commonwealth seeks injunctive relief and imposition of civil penalties against each defendant for their alleged violation between February and August, 1984, of the Virginia Antitrust Act. Code Sections 59.1-9.1 through 59.1-9.17.

The purpose of the Act as stated, "is to promote the free market system in the economy of this State by prohibiting restraints of trade and monopolistic practices that act or tend to act to decrease competition." (Section 59.1-9.2). "Every contract, combination or conspiracy in the restraint of trade or commerce of this State is unlawful." (Section 59.1-9.5).

The defendant, A.A. Mobile Market, Incorporated (A.A.), is a corporation organized and existing under the laws of Virginia, engaged in the business of selling at retail new and used mobile homes.

Elm Farms Mobile Home Park and Holly Acres Mobile Home Park are mobile home parks located in the Woodbridge area. Prior to February 1, 1984, A.A. operated both parks.

Prior to September 1, 1983, the defendant, Joseph R. Winslow, owned all the stock of A.A. and served as its president and chief executive officer; however, on that date, he sold all the stock of A.A. to B. B. Mobile Market, Inc. (B.B.), a corporation organized and existing under the laws of the Commonwealth of Virginia. B.B. is a holding company who owns all the stock of A.A.

The stock of B.B. is owned by Joseph R. Winslow's attorney, his accountant, his son, and by Warren Seymour, the president of A.A.

The defendant, Elm Farm Associates Limited Partnership, is a limited partnership organized on November 1, 1983, under the laws of the Commonwealth of Virginia.

The defendant, Joseph R. Winslow, is the only limited partner of Elm Farm Associates Limited Partnership, and was entitled to 99% of its profits during its first year of operation.

The defendant, Jerry C. Faircloth, and the defendant, Winslow, Inc., are the general partners of Elm Farm Associates Limited Partnership, owning 14% and 1% respectively.

The defendant, Winslow, Inc., is a corporation organized and existing under the laws of the Commonwealth of Virginia. Joseph R. Winslow owns all the stock and is its President. Jerry C. Faircloth is its Executive Vice-President.

These separate legal entities have been very artfully woven into a single economic unit operating for the financial benefit of the defendant, Joseph R. Winslow. He has maintained control by reservations, rights and veto power to protect indebtedness owed him in addition to security and unconditional guaranty agreements.

On February 1, 1984, Elm Farm Associates Limited Partnership, purchased from A.A. the land on which Elm Farms Mobile Home Park was located and received an assignment of the lease of the land on which Holly Acres Mobile Home Park was located. It immediately assumed responsibility for operation of the parks. Together, the two parks have a substantial number of the lots that are available for rent to owners of mobile homes. Present zoning laws are such that no new lots are being developed, thus those in the two defendant parks are much in demand or highly desirable.

This Court has previously ruled that mobile home lots and mobile homes are separate products and are therefore subject to be tied. It was further stated, perhaps prematurely, that in this case they are in fact tied for the purposes of analysis of the Virginia Antitrust Act; that the tying arrangement affects a substantial volume of commerce in the product market in which the defendants operate; and that the defendants have a substantial economic power. (Court's opinion letter of August 6, 1986.)

In addition to the pleadings and pretrial arguments, the trial evidence affirms those conclusions, and the Court finds that the defendants required persons who chose to live in a mobile home and desired a lot in the Woodbridge area because of access to jobs and highways and was within a "cost of living" range that they could afford to buy a mobile home from A.A. in order to lease a lot in either of the defendants' two parks. This is a tying

of two separate products,[1] and meets the four considerations identified in *United States v. Jerrald Electronics Corp.*, 187 F. Supp. 545 (E.D. Pa. 1960), affirmed, 365 U.S. 567 (1961), and quoted in *Jefferson Parrish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984). Those four considerations are: (1) do other sellers of tying product (mobile home lots in the Woodbridge, Virginia, area) permit separate sales of the tied product (new and used mobile homes)? The answer is, "yes"; (2) is the tied product fungible? The answer is, "yes"; (3) are the two products billed separately or by a lump sum? The answer, they are billed separately; (4) can the tied product be purchased elsewhere than from the defendant (A.A.)? Again, the answer is, "yes."

The Court further finds that this was done on at least seventeen sales which was a substantial portion of the sales at A.A. Mobile Market, Inc., during the period of the alleged violation and involved in excess of $250,000. (See Exhibits G and H.)

This is not an insubstantial volume of commerce.

The factors combined in the manner stated is *per se* illegal and evidence that the arrangement impaired competition in the sales of new and used mobile homes at retail in a specific market area was not necessary. *Jefferson Parrish.*

The court finds that the operators of the parks reserved lots as they became vacant and notified A.A. so that it could sell mobile homes. The fact that a lot was vacant, or was to become vacant, was communicated so that all defendants were aware. Persons who came to the park desiring to lease a lot that they knew was vacant, or was to become vacant, were given an excuse as to why the lot was not for lease. At the same time, A.A. could find a lot in one of the defendant parks, if in fact there were lots vacant or to become vacant for one of its customers (See Plaintiffs Exhibit 115 from the Park Coordinator to A.A.)

It appears that efforts were made by the park defendants to create vacancies by changing regulations and procedures that amounted to harassment to some tenants,

---

[1] See *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150 (6th Cir. 1980); *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.*, 101 Cal. App. 3rd 532, 161 Cal. Rptr. 811 (Cal. Ct. App. 1980).

causing them to leave. At least one departing tenant was advised that they could not sell their mobile home on the lot. It would have to be moved. The defendants denied this, but the Court did not find their excuse convincing.

The Court, in its opinion letter of August 6, 1986, opined that the arrangement affected a "substantial" volume of commerce. A preferred way to have stated its opinion would have been to find that "not an insubstantial" volume of commerce was affected. Defendants contest this finding. However, in *United States v. Loews, Inc.,* 371 U.S. 38 (1962), $60,800 was held not insubstantial; and in a case which I have not read, cited in the Commonwealth's Trial Brief, held $27,000 not insubstantial. *Microbyte Corp. v. New Jersey State Golf Association,* 51 Antitrust and Trade Reg. Rep. 8 (D. N.J. 1986).

Having found that the defendants tied two separate products; that the tying arrangement affected a not insubstantial volume of commerce in the tied product market; and that the defendants possess sufficient economic power in the tying product market to justify finding the arrangement *per se* illegal, the Court must determine whether the actions of the defendants were flagrant violations of Virginia Code Section 59.1-9.11. If so, then what is an appropriate civil penalty, and against whom should it be assessed.

The Court found that Joseph R. Winslow, prior to September, 1983, owned all the shares of A.A.; prior to February, 1984, A.A. operated both parks owning the land of one and a long term lease on the other. In September, 1983, Joseph R. Winslow sold all his stock in A.A. to B.B. for $2.2 million in promissory notes payable to him. Joseph R. Winslow retained the right to attend all meetings of the board of directors of A.A. and to block A.A. from paying dividends to B.B. or B.B. from paying dividends to its stockholders. Joseph R. Winslow had no interest in B.B. other than to have them pay the notes they owed him.

On November 1, 1983, Elm Farm Associates Limited Partnership was formed and for the first year of operation Joseph R. Winslow was entitled to 99% of its profits. The defendants Jerry C. Faircloth and Winslow, Inc., were general partners. Joseph R. Winslow owned all the stock of Winslow, Inc.

On February 1, 1984, Elm Farm Associates Limited Partnership purchased from A.A. the land of the one park and an assignment of the long term lease of the other. It then began to operate the parks.[2]

The March 27, 1984, minutes of the board of directors meeting of A.A. (Plaintiff's Exhibit 66) revealed that A.A. president advised that they had five mobile homes sold and no place to put them. He further stated, "We are hopeful that although Elm Farm and Holly Acres are now operating independently of A.A. that the policies adopted will be favorable to A.A." Two days later, five eviction notices went out, (Plaintiff's Exhibits 124, 125, 126, 127, 128 and 129) skirting requirements, to mask the underside of the mobile homes and keep out animals were established to be constructed out of a specific type material, and other requirements were imposed. (Plaintiff's Exhibits 129 and 130. See also Plaintiff's Exhibit E showing a comparison of Notices of Violations for April of each year from 1982 through 1985.)

On May 16, 1984, the Parks Department Supervisor advised the Elm Farm Park manager, who was also managing Holly Acres at the time, to advise her when someone gives notice of moving or just moves out suddenly so she could advise A.A. immediately. She was also giving them copies of all eviction notices in Elm Farm and Holly Acres. She further stated, "We want to keep A.A. updated on 'empties' as they have the first right of refusal on the lots." This action resulted in some vacancies being created but also triggered complaints to the County Consumer Affairs Office who conducted an investigation. All complaints mentioned two things, (1) that park management was dunning them about skirting, and (2) the age or condition of their mobile home. The only written complaints filed were by five former tenants after they left the park. Hubert King, the County Investigator, testified, "they told me they would not make a written complaint for fear of being evicted."

A shoppers investigation at A.A. sales office made contact with one Troy Dowell (deceased at the time of the trial) who held himself out to be a salesman for

[2] Elm Farm Associates Limited Partnership also acquired and operated other mobile home parks outside of the Woodbridge area and the Commonwealth of Virginia.

A.A. and volunteered that they control two parks in the Woodbridge area. He further stated that the dealer had to control the lots or could not sell.

After a thorough examination of the exhibits filed in this cause and having heard the oral testimony of the witnesses, the Court is of the opinion that the defendants Joseph R. Winslow, Jerry C. Faircloth and A.A. Mobile Markets, Inc., knowingly and willfully conspired to achieve a tying arrangement that resulted in a restraint of trade or commerce of this Commonwealth in violation of Section 59.1-9.5 of the Code. The Court further finds that said conduct was a flagrant violation and that no civil penalty or fine has been imposed pursuant to Federal law.

Accordingly, the opinion of the Court is that the Commonwealth is entitled to the relief prayed for as to all defendants and a civil penalty assessed against the defendant Joseph R. Winslow, in the amount of $60,000.00 and against the defendant, Jerry C. Faircloth, in the amount of $10,000.00 and against A.A. Mobile Market, Inc., in the amount of $30,000.00. No assessment of damages is made against the defendants, Elm Farm Associates Limited Partnership and Winslow, Inc.

The Commonwealth is also entitled to a reasonable attorney's fee and costs in its behalf expended to prosecute this cause. The only mention of the amount of costs was the uncontested statement at argument that the sum exceeded $11,000. This is insufficient to act upon. The Commonwealth is directed to furnish the Court with a statement of hours spent by attorneys and paralegals and of the costs expended upon the investigation and prosecution of this cause in order to set a reasonable attorney fee and cost.