In the Matter of the Application of THE CITY ICE & FUEL COMPANY and PAUL KURUTZ, Petitioners, Respondents, under Article 78 of the Civil Practice Act to Review a Determination Dated July 12, 1939, Made by THE PUBLIC SERVICE COMMISSION. OF THE STATE OF NEW YORK and Others, Respondents, in Favor of CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Corespondent, Appellant.*

Third Department, November 13, 1940.

---

* Confirming 173 Misc. 534.

*LeBoeuf, Machold & Lamb* [*Horace R. Lamb* of counsel], for the corespondent, appellant.

*Hess, Mela & Popkin* [*Harry F. Mela* and *Abraham S. Guterman* of counsel], for the petitioners.

*Gay H. Brown* [*George E. McVay* of counsel], for the Public Service Commission.

HEFFERNAN, J.   This is a special proceeding under article 78 of the Civil Practice Act to review a determination of the Public Service Commission and also an appeal from that part of an order of the Albany Special Term of the Supreme Court transferring the proceeding to this court which denied a motion to dismiss the proceeding.

The proceeding was instituted before the Public Service Commission on June 7, 1939, by petitioner, The City Ice & Fuel Company (hereinafter referred to as the Fuel Company), a corporation engaged in the manufacture and distribution of artificial ice and incidentally in the sale of ice boxes, against the Consolidated Edison Company of New York, Inc. (hereinafter referred to as the Edison Company), a utility which serves electricity and gas in the boroughs of Manhattan and Bronx, in connection with a " refrigerator campaign " conducted by the latter company in co-operation with a group of manufacturers and distributors of mechanical refrigerators. The copetitioner, Kurutz, is one of the Fuel Company's consumers and also one of its employees.

The refrigerator campaign against which petitioners' complaints were directed was inaugurated by the Edison Company after negotiations with thirteen distributors of electric refrigerators.

In recent years the Edison Company has conducted numerous promotional campaigns for the sale of various electric and gas appliances in addition to its ordinary routine merchandising activities.

Participating in the campaign, about which complaint is made, which began April 1, 1939, and continued until July 31, 1939, were distributors or manufacturers and retail dealers in such refrigerators, who co-operated with the Edison Company in a combined effort for the sale of mechanical or automatic refrigerators. Most of the leading makes of mechanical refrigerators were included in the campaign. In addition to the automatic refrigerators consuming electricity, there was one refrigerator, the Servel Electrolux, which consumed gas in its operations.

The plan followed in the campaign contemplated the sale of the various refrigerators through appliance dealers who had been approved by the Edison Company upon the basis of an agreement of such dealers to comply with certain standards agreed to by the dealers and the Edison Company.

The Edison Company did not engage in direct merchandising for it neither bought nor sold, installed or paid for the installation of any of the refrigerators involved in the campaign. Under its corporate powers, however, it might engage in merchandising and jobbing operations and in the sale and distribution of electric and gas appliances.

The Edison Company agreed to expend between $300,000 and $350,000 on advertising. It purchased extensive space in many metropolitan daily papers. The goal to be attained was the sale of 75,000 refrigerators. The proof shows that more than 82,000 were sold at a price in excess of $10,000,000. In addition there

were approximately 25,000 automatic units installed in housing developments. It was one of the merchandising features of the campaign that on the purchase of a new 1939 automatic refrigerator the purchaser could " turn in " an old-fashioned, i. e., a non-automatic refrigerator, which had been installed and was in actual use on the purchaser's premises on March 20, 1939, and receive an allowance of nine dollars and fifty cents against the purchase price of a new automatic refrigerator, purchased to replace the turned-in non-automatic refrigerator. The Edison Company agreed to contribute five dollars toward the nine dollars and fifty cents turn-in allowance, but provided that the old-fashioned machine should be actually delivered to it to be disposed of in such manner as it might determine. The Edison Company's contribution of five dollars was distributed among the retail dealers under an arrangement between those dealers and the distributors. Neither the Edison Company nor its employees received any compensation or commission from the manufacturer, distributor or dealer for any orders procured by such employees. Losses on orders taken by its employees were indemnified by the Edison Company. The Edison Company also underwrote in part, not to exceed eight per cent of balances outstanding, any default in commercial paper created in connection with sales under conditional sales agreements. Sales of refrigerators on part time and payment of conditional sales contracts were made under an arrangement with the National City Bank of New York, the details of which are not important here.

It is apparent that the purpose of the Edison Company in the campaign was to increase the consumption of gas and electric service. The offer of exchange was open to all its customers who were using non-mechanical refrigerators. The discount of nine dollars and fifty cents did not apply on the bill for electricity used by customers. Those customers who did not use non-mechanical refrigerators, those who did and who did not desire to take advantage of the offer and those who did own ice boxes and took advantage of the offer, all paid the same price for the current consumed on their premises, irrespective of whether or not some of such current was used in an automatic refrigerator.

The complaint of petitioners is grounded on the assertion that the acts of the Edison Company constitute a violation of subdivisions 2 and 3 of section 65 and subdivision 12 of section 66 of the Public Service Law which prohibit direct or indirect rebates, discriminations or departures from publicly scheduled rates by any gas or electric company. Petitioners asked that the Com-

mission prohibit the acts and practices of which they complained. Subdivisions 2 and 3 of section 65 read:

" 2. No gas corporation, electric corporation or municipality shall directly or indirectly, by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for gas or electricity or for any service rendered or to be rendered or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.

" 3. No gas corporation, electric corporation or municipality shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The material portion of subdivision 12 of section 66 is:

" The Commission shall:

" 12. Have power to require every gas corporation, electric corporation and municipality to file with the Commission and to print and keep open to public inspection schedules showing all rates and charges made, established or enforced or to be charged or enforced, all forms of contract or agreement and all rules and regulations relating to rates, charges or service used to or be used, and all general privileges and facilities granted or allowed by such gas corporation, electric corporation or municipality; but this subdivision shall not apply to State, municipal or Federal contracts. * * * No corporation or municipality shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such services as specified in its schedule filed and in effect at the time; nor shall any corporation or municipality refund or remit in any manner or by any device any portion of the rates or charges so specified, nor to extend to any person or corporation any form of contract or agreement, or any rule or regulation, or any privilege or facility, except such as are regularly and uniformly extended to all persons and corporations under like circumstances. * * * "

The principal question which we have to determine is whether or not the Edison Company's contribution toward the " trade-in " allowance constitutes a rebate or an unjust discrimination pro-

hibited by law. After a prolonged hearing in which several hundred pages of testimony were taken the Public Service Commission held that there was no evidence that the participation of the Edison Company in the campaign was in violation of the provisions of the Public Service Law. With that determination we are in full accord.

When a utility has established rate classifications available to all customers for a like and contemporaneous service it has fulfilled its obligations under the statute. When it treats all its appliance customers on a fair and equitable basis it has done all the law requires it to do. Subject to the two leading prohibitions that its charges shall not be unjust or unreasonable, and that it shall not unjustly discriminate so as to give undue preference or disadvantage to customers similarly circumstanced, the law leaves the utility, as it was at common law, free to extend its facilities and to afford inducements to encourage its business and to foster its interests on the same principles which are followed in other pursuits and trades. (*Interstate Commerce Comm.* v. *Chic. G. W. R. Co.*, 209 U. S. 108; *Interstate Commerce Comm.* v. *Alabama Midland R. Co.*, 168 id. 144; *Interstate Commerce Comm.* v. *Cincinnati, etc., R. Co.*, 167 id. 479; *Interstate Commerce Comm.* v. *Baltimore & Ohio R. R. Co.*, 145 id. 263.)

The practices of the Edison Company in the promotional campaign had no relation whatever to rates, charges or compensation received by it for gas or electric service or for any other service rendered by it or any of its subsidiaries or affiliates in the Consolidated Edison System. The Edison Company resorted to no " special rate, rebate, drawback or other device or method " in connection with its promotional campaign whereby there was charged, demanded, collected or received " from any person or corporation a greater or less compensation for gas or electricity or for any service rendered or to be rendered * * * than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions."

The sale of refrigerators even when made by a public utility is not the rendition of electric service. There is nothing in the Public Service Law which requires that the prices or terms of sale of appliances be filed with the Public Service Commission.

Petitioners criticise the text of the advertisements used in the campaign. The Public Service Commission has no jurisdiction of a complaint for unfair trade practices. An aggrieved person must resort to the courts for relief in such cases.

After the rendition of the Commission's decision petitioners applied to the Supreme Court for a review thereof and the order transferring the matter to this court was made. The Edison Company likewise applied to the court for a dismissal of the proceeding on legal grounds and that application was denied and the company has appealed from that order.

The Special Term in passing on these applications wrote an opinion, unreported, in which it held that " the facts are not in dispute " but that under the new procedure outlined in article 78 of the Civil Practice Act there is placed on the Special Term the burden of " deciding whether an issue of sufficient magnitude and law has been raised to submit to the Appellate Division for its determination."

The Edison Company applied for and was granted a reargument. Upon reargument the court wrote an opinion (173 Misc. 534) adhering to its original decision.

We cannot sanction the reasons which motivated the Special Term in arriving at its conclusion. We think the court inadvertently erred in its interpretation of the procedure to be followed under the new statute. For the guidance of the Special Term and the bar we feel it incumbent on us to restate our views as to the practice under article 78. That article does not confer upon the Special Term any discretionary power to determine whether a proceeding should or should not be transferred to the Appellate Division. Section 1296 of the Civil Practice Act provides that where issues are raised under subdivisions 1 to 5, inclusive, of that section the court to which the application is made shall itself dispose of the cause on the merits. The determination made is of course subject to review. Where issues are raised under either subdivisions 6 or 7 of that section the Special Term is required to make an order directing that the proceeding be transferred to the Appellate Division. However, even in such instances the Special Term may pass on objections to the petition in point of law and may dismiss it on the merits where it appears that petitioner is not entitled to relief because of the provisions of sections 1285 and 1286 of the Civil Practice Act. (*Matter of Brenner* v. *Bruckman*, 253 App. Div. 607; appeal dismissed, 278 N. Y. 503.) Where an order of transfer is made the proceeding becomes an original one in the Appellate Division. Under the new practice the jurisdiction of the Special Term, to which an application for the review of a determination by a public body or officer is made, is considerably enlarged and many of the duties and functions formerly exercised by the Appellate Division under the old certiorari practice are now delegated to the Special Term. In enacting

article 78 the Legislature intended that the Special Term should, in the first instance, determine the issues of law presented.

It is true, as urged by counsel for the Public Service Commission, that the determination which is the subject of this review " was made as the result of a hearing held, and at which evidence was taken, pursuant to statutory direction." It is undisputed, however, that the determination was made upon competent proof of the facts and that the determination as made is in accordance with the preponderance of the proof. No claim can be made that questions are presented in this proceeding which are comprehended by subdivisions 6 or 7 of section 1296 of the Civil Practice Act. No question is presented which justified a transfer of the proceeding to this court and consequently the Special Term itself should have decided the issues. Although the Special Term erroneously determined that the proceeding should be transferred to this court, we are authorized to make a final disposition of it. Section 1296 of the Civil Practice Act provides: " If the court erroneously decides that the issues in the cause are not such as to call for transfer of the cause to the Appellate Division, or if the converse occurs, the Appellate Division shall treat the cause, when the latter comes before it by appeal or transfer, as if the proper proceedings had been taken, and shall either dispose of the issues itself, or if the papers before it are not sufficient therefor, shall remit the proceeding to the proper term or court to be disposed of."

The determination of the Public Service Commission should be confirmed, with fifty dollars costs and disbursements against petitioners in favor of the Commission, and the appeal from the order of the Special Term transferring the proceeding to this court should be dismissed.

HILL, P. J., CRAPSER, BLISS and SCHENCK, JJ., concur.

Determination of the Public Service Commission confirmed, with fifty dollars costs and disbursements against petitioners, in favor of the Commission, and appeal from the order of the Special Term transferring proceeding to this court dismissed, without costs.