**WASHINGTON GAS LIGHT COMPANY, Plaintiff,**

**v.**

**. VIRGINIA ELECTRIC AND POWER COMPANY, Defendant.**

**Civ. A. No. 4544.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Jan. 30, 1970.

James H. Simmonds, Jr., of Simmonds, Coleburn, Towner & Carman, Arlington, Va., Herbert A. Bergson, Samuel H. Seymour and Mary-Margaret Gillen, of Bergson, Borkland, Margolis & Adler, Washington, D. C.; John J. Wilson, of Whiteford, Hart, Carmody & Wilson, Washington, D. C., of counsel, for plaintiff.

Lewis T. Booker, Richmond, Va., Howard W. Smith, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The Washington Gas Light Company, hereinafter called the Gas Company, brought this private anti-trust suit against Virginia Electric and Power Company, hereinafter referred to as Vepco, for injunctive relief and treble damages.

The issues were severed. This phase of the hearing was limited to the determination of liability.

The Gas Company claims Vepco's underground electric service plans, as first adopted August 7, 1963, violates both the Sherman and Clayton Anti-Trust Acts.

Both companies are public utilities engaged in interstate activities. The Gas Company is the sole supplier of natural gas and Vepco is the sole supplier of electricity in certain parts of Virginia. Their respective franchises overlap in much of Northern Virginia where they compete in the sale of energy for space and water heating, cooking, air conditioning, refrigeration and clothes drying.

All residential buildings must have electricity. Builders need it for operating their power tools and for interior lighting. It is the only practical source of energy available for operating many of the modern-day home appliances such as thermostats, vacuum cleaners, clothes washers, radios, televisions, and so forth.

Prior to 1960 practically all of Vepco's service connections were by means of overhead distribution lines. This service was furnished and installed by Vepco, at no charge to the builder.

Beginning in early 1960 many builders of new subdivisions became interested in underground electric service. Vepco made it available to those willing to pay the additional installation costs over and above the cost of overhead. Theoretically, a customer could furnish, install and maintain his own underground service; however, it is not feasible for him to so do. (Out of some ten thousand installed in Northern Virginia, all but five were installed and maintained by Vepco.)

Mortgage bankers, local governments and the general public became interested in underground electric service because of its esthetic and safety appeal—FHA and VA and most of the mortgage bankers now require it where feasible. It is now, and has been since the middle

of the '60s, a competitive necessity for the builders of residential subdivisions.

In November of 1962 Vepco reactivated its Residential Subdivision Underground Committee with instructions to develop a more liberal policy of furnishing underground electric service—One which is liberal enough to promote the use of electrical service—One that will make such projects either all electric or as fully electric as possible. The committee recommended a new plan expressly designed to accomplish that purpose.

Vepco adopted the recommendation and put the plan into effect August 7, 1963. Under its terms Vepco agreed to furnish underground electric service without charge to those builders who would go all electric—If the builder went all electric, except for space heating, he was required to furnish his own trenching and back-filling—If he would not agree to do either, he was required to pay $50.00 in addition to furnishing his own trenching and back-filling.

This plan remained in effect until 1964. Vepco then offered underground electric service without charge to builders agreeing to go all electric—For a builder who agreed to go all electric except for space heating, he could either furnish his own trenching and back-filling or pay Vepco $100.00. If he would not agree to do either, he had to pay $275.00 for his underground electric service even though he furnished his own trenching and back-filling.

The $275.00 charge was imposed to penalize builders if they used other forms of energy for water heating, cooking and so forth.

After these plans were put into effect Vepco substantially increased its total electric penetration in the new-house market in the overlap area.

Neither plan was ever approved by any regulatory agency. The Virginia State Corporation Commission disapproved the $275.00 plan October 17, 1966 because the waiver of the cost for underground electric service was tied generally to the total electric concept.

Vepco shortly thereafter—February 1, 1967—promulgated a new underground electric service plan, the installation charge being the average difference in cost between underground and overhead facilities, with a credit based on anticipated revenue. The cost differential was computed to be $280.00 per lot—A credit of $40.00 against this charge was allowed for each two thousand kilowatt hours above the first six thousand annual kilowatt hours of electricity used. The anticipated consumption was determined from a table listing the annual kilowatt hours' usage of various electrical appliances in homes of different sizes. Reduced to simplicity, a builder under this plan had to agree to go all electric to obtain underground electric service without charge. If he agreed to go all electric except for space heating, the charge was reduced to around $100.00. If he were to agree to neither, his charge for underground service ranged from $280.00 to $200.00, depending on the size of the house and whether electricity was used for air conditioning or clothes drying.

This suit was filed July 28, 1967. In August of that year the North Carolina Utilities Commission held the $280.00 plan unlawful and any charge Vepco makes for underground electric service must be in the form of a surcharge to the existing rates without any credit based on electric usage. Instead of following this procedure in Virginia, Vepco, on December 15, 1967, reduced its underground charge from $280.00 to $150.00 per lot, retaining the same schedule of credits based upon the same consumption tables as used in the $280.00 plan.

Under the 1967 plan it is not necessary to use electric space heating in order to obtain underground electric service without charge. Absent agreeing to use an electric water heater, the builder still has to pay approximately $100.00 per lot for installation of underground service.

When space heating ceased to be a requirement for the installation of un-

derground electric service without charge, Vepco's total electric penetration in the overlap market dropped from 21.4 per cent to 4.5 per cent.

With the beginning of the 1963 plan the estimated charge for underground electric service has been somewhat wide of the actual installation costs. A Vepco official, in one of his interoffice memoranda, admitted Vepco started with the answer ($270.00–$290.00 cost differential) and justified this with engineering estimates. Even now there is some question as to some items included in the estimated charge and some question as to the amount of credit that should be allowed for the differential in the cost of maintaining the underground system as compared to the cost of maintaining the overhead system.

Vepco has always required the estimated cost of underground installations for all the lots in the new subdivisions to be paid in advance.

Of the numerous builders who testified in this case, all felt underground electric service was a business necessity for the type of subdivisions they were then building—All said if given a free choice they would have used gas for space heating—Most said they would have used gas for water heating—Many said they would have given their customers a choice of using gas or electricity for cooking. All felt that they were induced—many thought they were coerced—into using electrical water heating in order to recoup a portion of Vepco's charge for installing its underground electrical system.

The statistical evidence in the case indicates that prior to 1963, 99 per cent of the builders used gas for space heating—95 per cent used gas for water heating—60 per cent used gas for cooking. After Vepco's '63 underground service plan and amended plans were put into effect, its share of space heating in the overlap area increased from one per cent to 21 per cent of the market—water heating, from five to 71 per cent—cooking, from 40 to 71 per cent—

Some 20.7 per cent of the homes using underground service went all electric compared with 3.2 per cent of the homes using overhead service. This percentage dropped to 4.5 in 1968 when the space heating requirement was eliminated.

Under the $275.00 and $280.00 plans the number of new homes using gas for space heating dropped to 79 per cent of the market. Those using gas for water heating dropped to 29.1 per cent. Those using gas for cooking dropped to 28.6 per cent of the market.

Section 1 of the Sherman Anti-Trust Act (Title 15 U.S.C.) declares:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

Although this section prohibits only unreasonable restraints, certain practices are unreasonable per se—that is, they "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." See Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

The stringency of the per se rule laid down in the Northern Pacific case was recognized by the Court of Appeals of this circuit in Osborn v. Sinclair Refining Company, 286 F.2d 832 (1960). The Fourth Circuit there said:

"The standard in Northern Pacific is a quantitative one. Just so the seller is of sufficient size to exert some power and the amount of commerce restrained is not insignificant, the standard is met. If all of the industry-wide economic data had to be shown for which [defendant] argues, it would convert tie-in cases to 'rule of reason' cases with the requirement of public injury. When facts, as here, reveal a per se restraint of trade, it is not necessary for the plaintiff to prove, by voluminous economic data,

that the public generally has been injured."

In the Northern Pacific case, supra, the Supreme Court said:

"* * * the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not.

\* \* \* \* \* \*

"They [tying arrangements] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products \* \* \*."

The foregoing requirements for the finding of a per se tying agreement were reiterated by the Supreme Court in its most recent antitrust case. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

Applying these teachings to Vepco's underground electric service plan, the Court finds Vepco had a monopoly in the installation of underground electric service, and was the sole seller of electricity in the overlap area.

From 1960 to 1963 Vepco made its underground electric service available to all builders on the same basis, without regard to the appliances used or the amount of electricity consumed—Builders were then only required to pay the additional cost of the underground installation. When the mortgage bankers, local governments, federal agencies and the general public all began to show great interest in underground electric service in the new subdivisions, Vepco used its monopoly in furnishing this service in order to promote the use of electricity. This was accomplished, first, by tying the cost of the underground installation to the use of certain electrical appliances; later, by giving credits based on the amount of electricity used over the first six thousand kilowatt hours. If the builder agreed to go all electric or all electric except space heating, Vepco furnished the underground service without cost or at a substantially reduced price, otherwise the builder was required to pay a much larger fee for the same service.

Such a tie-in not only deprives the builder of a free choice in selecting what energy (gas or electricity) he and his customers want to use for space and water heating—it penalizes him if he elects to use gas. If he goes all electric his customer is prohibited from using gas for any purpose even though the record here discloses that gas is more economical for space and water heating than electricity.

The Maryland Public Service Commission, in refusing to allow the Potomac Electric Power Company to install a similar underground electric service plan in Maryland, said:

The practice does, in fact, create a discriminatory pattern in that it gives the builder an improper incentive to elect "all electric" so as to save the undergrounding charge, whereas the builder who does not or cannot make such an election receives exactly the same service and must pay what amounts to a penalty of $300 which is passed on to the purchaser in the cost of the house. The charging and waiving imposes unequal charges on the same types of customers for the same service. Suburban Maryland Home Builders Ass'n v. Potomac Electric Power Co., 72 PUR 3rd 282 (1968).

The outlawed IBM tying arrangement which required all lessees of its business machines, except the United States, to purchase the necessary cards from IBM (the United States could use other cards if it paid a higher rental), embodies the same tying concept as employed by Vepco in this case; that is, a differential in the cost of the same service unless the user agreed to take the tied product.

The fact that the builder can retain his freedom of choice by paying Vepco's estimated charge for underground service is beside the point. Such option does not validate an otherwise invalid tying arrangement.

In the International Salt case the lessee was not obligated to buy salt from International if any competitor offered salt of equal grade at a lower price. The Supreme Court in that case—International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) —held such an option

> "does not avoid the stifling effect of the agreement on competition. The appellant had at all times a priority on the business at equal prices. A competitor would have to undercut appellant's price to have any hope of capturing the market, while appellant could hold that market by merely meeting competition. * * *"

Here the tied product—electricity— cost more than gas for space and water heating.

The Gas Company should not be required to subsidize the builders' payment of Vepco's underground installation charge in order to have free access to the new homes' space and water heating market.

Having determined that Vepco's underground service plans since 1963 are in fact and in law tying arrangements, the Court must next determine whether Vepco has sufficient economic power with respect to the tying product and whether it has used that power to appreciably restrict free competition for the tied product. The answer to both of these questions is yes. Vepco has a monopoly in the installation of underground electric service. It furnishes, owns and maintains practically 100 per cent of the underground service installed in the overlap area—It fixes the cost thereof, originally somewhat inflated. This charge is high enough, if waived or substantially reduced, to induce the builder to take electricity for space and water heating, and the evidence discloses that many builders in the overlap area have so done.

Next the Court must determine whether a "not insubstantial amount" of interstate commerce is affected. Measured by the yardstick laid down in the International Salt case, supra, and in United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the answer is yes. Vepco derives more than four million dollars per year in additional revenue from the new homes which have gone totally electric or totally electric except space heating under the underground service plans in question—more than seven hundred thousand dollars of which are derived from new homes located in the overlap area where the parties compete.

The necessary interstate aspect of the commerce affected by the challenged tying arrangement to bring this case within the Sherman and Clayton Acts is beyond question. The defendant so concedes.

In defending the charges brought against it, Vepco has produced considerable evidence enumerating the business and economic justification for its underground service plans—such as creating competition in the space and water heating market where none before existed; recovering its investment in the underground service; and in promoting safety and community beauty, and so forth—all of which is immaterial when the tying arrangement complained of is found to be a per se violation of the Sherman Act.

The United States Court of Appeals for the Fourth Circuit, in rejecting a similar contention made by Consolidated in the Pennsylvania Water & Power Company v. Consolidated Gas, Electric Light & Power Company case, 184 F.2d 552 (1950), said:

> " * * * the prohibitions of the statute apply even though the parties to a contract indulge the belief that the agreement may have beneficial results and actually show that in some respects the public is benefitted there-

by. Congress has determined that the greater good is served by the maintenance of free competition and its decision in the field of interstate commerce must control."

Vepco further contends that this Court should not invalidate its underground service plan unless it finds that Vepco refuses to install underground service unless the builder makes certain uses of electricity—and that the tie-in carries with it the complete foreclosure of the Gas Company from the space and water heating market in the overlap area.

■ This Court does not read the cases cited by Vepco as so requiring. The legal test for determining whether a tie-in exists is whether customers are deprived of their free choice between competing products and whether competitors are denied free access to the market for the tied product—not because the party imposing the tying product has a better product or a lower price but because of his power or leverage in another market. In Northern Pacific, supra (356 U.S. at page 6, 78 S.Ct. 514; see also Loew's, Inc., supra, 371 U.S. at page 45, 83 S.Ct. 97), it was held that the tying was illegal if the arrangement gives the defendant economic leverage sufficient to induce his customers to take the tied product along with the tying item.

Clearly, Vepco's underground service plan does not give the builder a free choice. Making him pay a substantial fee for the service unless he agrees to use certain appliances is not a free choice.

Although, technically speaking, the Gas Company may not be completely foreclosed from the heating market in the overlap area, it is effectively foreclosed from all or part of the heating market in those cases where the builders go all electric or all electric except for space heating.

Vepco next contends there can be no compulsion when a builder can recoup his cost by increasing the sale price of his house—that the undisputed testimony of the expert real estate appraiser expressed the opinion that a house served by underground electric wiring will bring at least $300.00 more than an identical home served overhead. Although Vepco cites no authority that such would validate an otherwise invalid tying arrangement, the Supreme Court, in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), rejected this so-called "passing on" defense in antitrust cases and held that a buyer who is overcharged by a monopolist is injured even though he can pass the overcharge along to the ultimate consumer.

■ This Court further finds that Vepco's underground installation contracts violate § 3 of the Clayton Act, 15 U.S.C. § 14. That section reads as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Vepco's underground service agreement in part provides for the sale of electricity to the builder and his successor, the home buyer. The builder indicates when he wishes to start using elec-

tricity—He pays for the electricity used until the house is sold and occupied—No new contract is then entered into with the home buyer—The name on the service agreement is changed in Vepco's accounting department. The agreement further provides a fixed price for the installation of underground electric service; that full credit will be given if electricity is exclusively used for all purposes or for all purposes except space heating in all of the homes in the subdivision—the later agreements provide for a credit to the builder based upon the amount of electricity used over and above the first six thousand kilowatt hours. Unless he uses electricity for water heating he cannot recoup all of the charges for underground service.

Although this Court is not expressly ruling that these underground service agreements are binding on the builder's successors, the home buyers, it obviously is—for all practical purposes—because once a builder goes all electric the home buyer cannot use gas for any purpose; and in those cases where the builder goes all electric except space heating, the home buyer cannot use gas for water heating, cooking, air conditioning or clothes drying unless he rips out and disposes of all the electrical appliances that are in the house and replaces them with gas appliances at his own expense.

The credit allowances mentioned in the later underground service agreements are in fact discounts in the price of electricity; when used as here used—to induce exclusive dealing—they are prohibited by § 3 of the Clayton Act.

■ Agreements coming within the ambit of the Clayton Act are condemned without proof of an accomplished restraint of trade; it is sufficient that the agreements may substantially lessen competition or tend to create a monopoly in any line of commerce. The evidence in this case clearly establishes that Vepco's underground installation agreements have substantially restrained free competition in the sale of energy requirements to new-home builders, especially for heating purposes.

Finally, although Vepco does not now contend that the Gas Company's promotional programs are unlawful, or suggest that the defenses of unclean hands or in pari delicto are applicable, it has asked the Court to carefully review the voluminous amount of evidence introduced re the Gas Company's business practices before concluding that its underground service plans coerce builders and foreclose the Gas Company from competing.

■ Although this Court has so done, the Gas Company's business practices, even though illegal (and no findings as to illegality are here made), are not a defense to the antitrust violations charged to the defendant. See Kiefer-Stewart Company v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

■ As hereinbefore stated in this memorandum opinion, complete foreclosure from the market or coercion by force is not a prerequisite to a finding of invalidity under the Sherman and Clayton Anti-Trust Acts. The vice of the tying arrangement here lies in Vepco's use of its monopoly power in the underground service installation market to restrict competition on the merits in the use of gas or electricity in the space and water heating requirements of the new-home building industry.

Upon these findings, the Court concludes that Vepco's underground electric service plans, beginning with the plan adopted August 7, 1963 up to and including the plan now in effect, and the agreements made in pursuance thereof, affect interstate commerce within the meaning of § 1 of the Sherman Act and § 3 of the Clayton Act; that said plans and agreements as administered are per se tying arrangements prohibited by § 1 of the Sherman Act and that said plans and agreements as administered constitute unlawful exclusive dealing arrangements prohibited by § 3 of the Clayton Act; and that the Gas Company is, therefore, entitled to damages and costs in an amount to be determined later.

Counsel for the plaintiff should prepare an appropriate order declaring Vepco's underground service plans and agreements to be unlawful, together with an injunction restraining Vepco from continuing to use its underground monopoly to coerce or induce builders to use electricity, submit the same to counsel for the defendant for approval as to form, and then to the Court for entry.