Joseph Life, J.
Plaintiffs are engaged in the business of supplying fuel oil for heating purposes to homeowners and other consumers in the Town of Huntington, Suffolk County. The defendant is a public utility franchised to distribute and sell electric power and gas in that town.
In December, 1964 the Planning Board of the town adopted a resolution effective January, .1965 which provided that thereafter electric and telephone wiring should be installed underground except where the Planning Board in special cir *667 cumstances waived the requirement (art. XII, Subdivision Regulations). The regulatory body in this State, that is, the Public Service Commission, permitted the defendant to make a charge for underground installation.
The plaintiffs compete with the defendant in promoting the sale of fuel oil and gas respectively for space heating purposes. In doing so, the defendant and the fuel oil dealers (the plaintiffs among them), granted inducements, subsidies, premiums, etc., to builders, some of which will be described in the course of this decision. Needless to say these special benefits are many, varied and ingenious, as would be expected in a free enterprise system.
When the township promulgated its ordinance, the defendant employed the new requirement as an additional device to induce builders to supply gas-fueled equipment for space heating purposes. Using the right which they had to impose a charge for the burial of underground electric lines, it undertook to forgive the charge where a builder installed gas for heating. The rationalization for that procedure was that the defendant thus effected a saving by digging one trench in which the gas and electric lines could both be laid. Obviously it is less costly to dig one than two trenches, but except for that it was not apparent how a saving was achieved. Moreover, if a house were to be supplied with gas for any purpose it would seem that the lines for electricity and gas should still be located in the one trench.
The plaintiffs complain that once a builder makes a choice, the purchasers are precluded from making an independent selection as to the type of heating fuel preferred and are compelled to accept what has been provided. They charge also that the cost for burying the electric line is in normal course passed on to the buyer. Therefore, it follows, the plaintiffs say that not only the builders but the purchasers as well are deprived of a free choice. In conclusion they allege that the defendant in violation of law entered into agreements, arrangements and contracts to install gas heat and to prevent and eliminate the competition of oil heat and to prevent the plaintiff's from conducting their business of selling fuel oil, all of which have interfered with free competition between the industries of gas and oil and they ask for an injunction against the acts complained of.
The defendant counters these allegations in substance by a general denial. The defendant also alleges that its contracts were approved by the Public Service Commission. It pleads in excuse that plaintiffs’ complaints should not be entertained because plaintiffs too make promotional inducements. That plea has been held (Meenan Oil Co. v. Long Is. Light. Co., 56 Misc *668 2d 425) not to constitute a defense which would defeat the plaintiffs’ cause of action.
Plaintiffs served the statutory notice on the Attorney-General but he did not intervene (General Business Law, § 340, subd. 5).
It would be well to review some of the testimony which was presented to the court for his consideration. Testifying for the plaintiffs, Mr. Joseph T. McDonald, Jr., Assistant Deputy Director of the Department of Engineering, Building and Housing of the Town of Huntington, recounted that in 1969, 1,239 permits had been issued and that of these 80 to 90% of the heating installations were for gas.
Plaintiffs are not complaining of competition but that when the ordinance was introduced defendant acquired a special advantage which it employs improperly to compel builders to install gas for heating. The testimony of plaintiffs’ witnesses to an extent was of a conclusory nature in the absence of supporting data. Although there may have been a decline in the number of fuel oil installations it may also be that there was a decline in building permits issued because of inflation, the tightened market in mortgage money, and other factors.
Another area which was insufficiently explored was the drop-off in oil installations attributable to the desirability of gas and the increased cost of fuel oil as compared to gas. One consumer testified that although he desired it, fuel oil was not available to him except at an increased cost running into several hundreds of dollars.
Of course once gas was installed, a conversion from gas to fuel oil could be made only at a considerable expenditure.
The saving to builders was significant on the individual home and could become substantial in proportion to the size of the project. For example, a savings of $200 on a home, where as many as 100 homes were constructed, could result in a windfall of $20,000. There was testimony that in some instances a builder would return to oil when overhead wiring was available and he was no longer confronted with the cost for the burial of electric power lines.
One fuel oil dealer related that although he had established an excellent business relationship with a particular builder, the day came when he was summarily told that the defendant had offered such benefits that he could no longer approach them and that there would be no purpose served by negotiation. Still that same builder in an area outside the township made the choice of oil.
It might be remarked here that although the defendant may not achieve a monopoly it does not follow that the practice is one *669 which can avoid the condemnation of the statute so long as it may tend to create the monopoly or restrain competition (37 N. Y. Jur., Monopolies, § 4 et seq.; § 12 et seq.).
Among the inducements which were granted, and without trying to enumerate them all but solely to illustrate, were: a minimum charge for installation; a supply of fuel oil to builders’ offices and to model homes; a discount on oil; a down payment in cash; a percentage of fuel oil sales over a term of years (with the highest percentage paid in the first two years and the last three years contingent upon the purchasers continuing to use the services of the dealer); free service for a year (sometimes three or even five years); contributions to advertising; directional signs and other signs in the development. There were others. It was obvious that the number and extent would vary depending on the size of a project and the negotiating power of the builder.
Another witness said that he attributed his diminished business to the fact that his sources were changing to gas heat. The plaintiff Meenan was an aggressive and industrious seeker after fuel oil installations. It too experienced not only a marked decrease in installations but as well in the opportunities for seeking business. Meenan had an entrée with one of the largest builders of our time and his dealings with that organization were terminated because of the builder’s new found preference for gas.
All in all, however, the testimony was less than conclusive that there were not other factors which led to lost opportunities for the fuel oil dealers.
Since the conclusion of the trial the court learned that the activities of public utilities in their endeavors to obtain additional consumers for their supply of energy for space heating purposes caught the attention of a Congressional committee and were the subject of a special inquiry. Subcommittee No. 5 to the Select Committee on Small Business of the House of Representatives (also known as the Dingell Committee, from the name of its Chairman, Hon. John D. Dingell, M. C. of Michigan), on December 31, 1968 filed an interesting report on the subject entitled “Promotional Practices by Public Utilities and Their Effect Upon Small Business” (hereinafter referred to as “ Report ”).
The Committee’s purpose was “to determine the nature of promotional practices being currently utilized by public utilities in their marketing of electricity and natural gas, together with those marketing other energy forms in competition with the public utility companies. ’ ’
*670 In their report the committee expressed optimism that public utility regulatory bodies in the separate States would adopt more restrictive policies.
In New York a situation arose where a group of fuel oil dealers complained of similar practices and the Public Service Commission in its decision had said that it would 1 ‘ continue to scrutinize all promotional practices of all public utilities subject to our jurisdiction, to the end that their obligations under the Public Service Law are fully met. ’ ’
The commission went on to enumerate four rules for the guidance of the companies in making promotional inducements. These were as follows:
“ (1) Promotional inducements may never vary the rates, charges, rules, and regulations of the tariff pursuant to which service, is rendered to the customer.
“ (2) Promotional inducements must be uniformly and contemporaneously available to all persons within a reasonably defined group.
“ (3) The costs of the promotional practices must not be so large as to impose a burden on customers in general and must be recoverable through related sales stimulation within a reasonable period of time.
“ (4) The size and nature of the allowance or other promotional inducement must be reasonably related to the objective sought to be achieved and reasonably expected to promote the interests of the utility and its customers. ” (Empire State Petroleum & Fuel Merchants Assn. v. Consolidated Edison Co. of N. Y., 68 PUR 3d 162, 170.)
The Dingell Committee was concerned with unfair competition, restraint of trade, tie-in transactions, and the effect of these practices on the small business man. It was noted that fuel oil dealers could compete freely with each other but that when they were confronted with a utility which was in a very real sense a monopoly, the latter had in its possession a number of factors, including size and economic power, with which the oil dealer could not contend.
The defendant here was represented in the hearings. An observation was made that the Public Service Commission in this State had admonished utilities ‘ ‘ to exercise extreme caution in any further extension of their promotional activities ’ ’. This reference by the committee was to Empire State Petroleum & Fuel Merchants Assn. v Consolidated Edison Co. of N. Y. (supra). In their conclusions the committee noted (as we do too) that promotional practices are consistent with the economic practices in this country, while recognizing that the bounds of *671 propriety can be exceeded, and they found that allowances were being made in order to exclude other fuels from the market. They remarked on the combination of special rates and special deals which could result in an over-all loss on the transaction at the expense of other ratepayers who would then be “ subsidizing such transactions ’ ’. They concluded that ‘1 The whole system of payment to third parties, such as builders, promoters, or developers smacks of venality ’ ’; that payments were made in secret, secretly negotiated; that utilities have accomplished their aims because others cannot compete with them; that underground wiring was used to further their purposes; that the funds of the utility used for these inducements came from rates which the public pays and that by receiving bonuses and rebates builders were being more favorably treated. At one point the subcommittee rather prayerfully said that it hoped that the State bodies would move effectively to restrict the manner in which promotional allowances might be made and that they should not be secret, ‘ ‘ individually negotiated ’ ’ or unregulated. They also found that the effect of the programs had been to lock others fully out of the market. The report concludes with seven enumerated recommendations which are suggestions for a curative program.
It appears that the use of the word ‘ ‘ arrangement ’ ’ in the statute (§ 340) was designed for the purpose of reaching a set of circumstances which might not fit quite into the term ‘ ‘ contract ”, “ agreement ” or “ combination ” (37 N. Y. Jur., Monopolies, § 15). The practices of a corporation holding a franchise from the public require a closer examination than those of private companies (37 N. Y. Jur., Monopolies, § 33; cf. an interesting discussion of this thought in Central N. Y. Tel. & Tel. Co. v. Averill, 199 N. Y. 128). Of course it seems to us that there is no need to examine the transactions microscopically when a pattern emerges from the inquiry.
We have concluded that the practice of the defendant in forgiving or adjusting charges for the burial of underground electric wire in the Town of Huntington is prohibited under section 65 of the Public Service Law and that it is against public policy, illegal and void under section 340 of the General Business Law. The practice offends against section 65 in that it constitutes a special rate and rebate, etc. which is interdicted under subdivisions 2 and 3 of section 65.
We direct attention to the practice of the defendant negotiating separately with different builders for varying benefits, and the advantages which the builder might obtain would depend upon the success of his negotiations and varied consider *672 ably. This is a discrimination as among builders and against other rate paying consumers who would be subsidizing the defendant’s special transactions with preferred customers.
We also conclude that the idea that in finding greater markets all consumers are ultimately benefited is an illusory one for which no foundation in fact has been offered. This is especially so if we consider that the subsidy might be an expense which would take many years to recover from the sale of gas.
The practices of the defendant tended to create a monopoly for it in the furnishing of energy for space heating and that conclusion is not defeated by the fact that its aims were not entirely achieved. The defendant’s conduct resulted in an unreasonable restraint because of the special advantage enjoyed by it, a practical monopoly, in that the purchasers of homes as well as the builders thereof were deprived of a free choice because the defendant employed an effective tie-in arrangement. The choice for the builder or the ultimate purchaser was no longer one as between gas and fuel oil, each depending for its selection on particular merits. The choice became one of gas as against fuel oil and the selection of the first would relieve the builder or purchaser from the obligation to pay for the burial of the underground wiring.
We have not found authority in this State which would provide a guiding precedent here.
The Court of Appeals indicated the course to be taken when they said (Matter of Aimcee Wholesale Corp., 21 N Y 2d 621, 626) that the language of section 340 was ‘ ‘ almost a copy of section 1 of the Sherman Act ’ ’ and represented ‘ ‘ an equally strong public policy in favor of free competition for New York ” and they adopted in principle the statement of the Supreme Court of the United States in Northern Pacific Ry. Co. v. United States (356 U. S. 1, 4-5) where that court'said: “ The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits ‘ Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States. ’ ”
*673 A practice would meet the condemnation of the statute wherever the end soug’ht to he avoided may be accomplished by the practice (Manhattan Stor. & Warehouse Co. v. Movers d Warehousemen’s Assn., 262 App. Div. 332, revd. on other grounds 289 N. Y. 82).
In the Manhattan Stor. case, the court held that Federal cases, while not necessarily controlling, would be given great weight where the determinations were made on similar issues and particulary where the questions were of an economic nature.
The facts here and the conclusions arrived at from those facts are comparable to the situation in Washington Gas Light Co. v. Virginia Elec. & Power Co. (309 F. Supp. 1119). There the plaintiff gas company brought a private antitrust suit against the defendant, a supplier of electric energy. Washington sought a judgment to declare certain of defendant’s practices unlawful and an injunction to restrain their continuance. The franchises of the parties overlapped and in the area common to both they competed for the sale of energy for heating, cooking, etc. The defendant adopted a policy of forgiving or scaling downward the charges for underground electric service as the builder employed electric for space heating, cooking, etc. The court held the practice to be a tie-in arrangement in that economic power in one market was used to restrict competition on the merits in another. Further, that court said that where a tying arrangement is revealed the rule of reason can be abandoned because the tie-in is per se a restraint of trade from which it follows that the public has been injured.
The conclusions arrived at by the court in the Washington Gas case may be applied here. As we have said, as a result of the defendant’s practice the builder is deprived of a free choice as between gas and fuel oil for he must pay an additional sum should he elect gas. We find apt here the language quoted by the court in the Washington Gas case from the decision of the Maryland Public Service 'Commission in Suburban Maryland Home Bldrs. Assn. v. Potomac Elec. Power Co. (72 PUR 3d 282 [1968]). That body condemned the practice of exacting a charge for underground wiring and said (p. 289): “ does, in fact, create a discriminatory pattern in that it gives the builder an improper incentive to elect ‘ all electric ’ so as to save the undergrounding charge, whereas the builder who does not or cannot make such an election receives exactly the same service and must pay what amounts to a penalty of $300 which is passed on to the purchaser in the cost of the house. The charging and waiving imposes unequal charges on the same types of cus *674 tomers for the same service. This is clearly illegal under the provisions of § 26 of the Public Service 'Commission Law.”
While we are in accord with the conclusions and the principles enunciated by the Maryland Public Service Commission and the court in the Washington Gas case, we would not refer to the payment for underground wiring as a “ penalty ”, though terming it a forgiveness does not change its effect. The court in Washington said (p. 1126): “ The vice of the tying arrangement here lies in Vepco’s use of its monopoly power in the underground service installation market to restrict competition on the merits in the use of gas or electricity in the space and water heating requirements of the new-home building industry. ’ ’
We should like to emphasize here that we are not reviewing an administrative determination. The complaint here is one made under section 340 of the General Business Law, of which the Public Service Commission does not have jurisdiction. That body in the Empire State Petroleum & Fuel Merchants Assn. case said '(68 PUR 3d 162, 170, supra) that they were merely determining the propriety of the practices complained of under the Public Service Law and concluding that the complainant’s posture was as a competitor rather than as a consumer, suggested that “ its complaints may be addressed to other forums.”
The public service corporation, by virtue of its acceptance of a franchise, foregoes a right to choose its customers or to discriminate among them 1 ‘ by extending unreasonable conditions and preferences to some, but must serve all on the basis of fairness and equality.” (Brewer v. Brooklyn Union Gas Co., 33 Misc 2d 1015, 1019; to the same effect, Matter of City Ice & Fuel Co. v. Public Serv. Comm., 260 App. Div. 537, 542.)
The “tie-in” here is not one in the classic sense; that is, where the seller withholds product “ A ” unless .the buyer also takes product “ B ”, but we view it as a tie-in nonetheless.
In Fortner Enterprises v. United States Steel (394 U. S. 495) an extension of credit was used to effect the .sale of a commodity. It is not straining to conclude that in this instance, the forgiveness of a charge for underground wire was employed to accomplish the sale of gas for space heating. The seller here, the defendant, had the ‘1 dominant power ’ ’ over the underground charge so that there could be no question about its ability to exert that power (cf. Fortner Enterprises v. United States Steel, supra, p. 503 et seq.)
We repeat in part what was said in Northern Pacific Ry. Co. v. United States (356 U. S. 1, 4, supra) that the Sherman A.ct 1 ‘ was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition *675 as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.” And on page 6, speaking of tying agreements, the court said that they “ deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. * * * They are unreasonable in apd of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a ‘ not insubstantial ’ amount of interstate commerce is affected.”
Applying the language to our case there can be no question as to the defendant’s having sufficient economic power. Its power is of a monopolistic nature and to permit it to continue its practices would restrict free competition as between the sources of energy (cf. Times-Picayune v. United States, 345 U. S. 594; United States v. Loew’s Inc., 371 U. S. 38).
Free and open competition is the ideal. Agreements which prevent or restrict it are harmful and it follows that they are unlawful.
The defendant offered no proof in support of its position and moved to dismiss the complaint. That motion is denied.
The judgment herein will grant relief to the plaintiffs as they have requested it; that is, to restrain the defendant’s practices in the Town of Huntington. The court expressly refrains from making any determination as to the practice in other areas where the defendant serves the public because these issues were not presented for determination.