**UNITED STATES of America,**
**Plaintiff,**

v.

**GREATER BUFFALO PRESS, INC.,**
**et al., Defendants.**

**Civ. No. 9004.**

United States District Court,
W. D. New York.

May 26, 1970.

Lewis Bernstein and Elliott H. Feldman, Attys., Dept. of Justice, Antitrust Division, Washington, D. C., for the United States.

Frank G. Raichle, Raichle, Banning, Weiss & Halpern, Buffalo, N. Y., for defendants Greater Buffalo Press, Inc., International Color Printing Corp., Southwest Color Printing Corp. and Dixie Color Printing Corp.

Richard F. Stevens, and Sargent Karch, Baker, Hostetler & Patterson, Cleveland, Ohio, for defendant Newspaper Enterprise Assn. Inc.

JOHN O. HENDERSON, Chief Judge.

### FINDINGS OF FACT

This action arises out of a complaint filed by the government in January 1961, charging certain defendants with violations of the Sherman and Clayton Acts. The complaint charged that Greater Buffalo Press, Inc. (hereinafter Greater Buffalo) engaged in a conspiracy with the Hearst Corporation (hereinafter Hearst) and Newspaper Enterprise Association, Inc. (hereinafter NEA) to restrain interstate commerce in the sale of color comic supplements by refraining from soliciting printing business from each other's customers and by maintaining and stabilizing the price of color comic supplement printing in violation of section 1 of the Sherman Act. The complaint also charged the same defendants with engaging in a conspiracy to monopolize color comic supplements in violation of section 2 of the Sherman Act, and Greater Buffalo is charged with violation of section 7 of the Clayton Act (15 U.S.C. § 18) regarding its 1955 acquisition of the outstanding stock of defendant International Color Printing Corporation (hereinafter International), since it is alleged that the acquisition constitutes a substantial lessening of competition and tends to create a monopoly with regard to color comic printing in the United States. Lastly, the defendants Hearst and NEA were charged with violation of section 3 of the Clayton Act (15 U.S.C. § 14), for allegedly selling comic features to newspapers at discounts on the condition that the newspaper purchasers shall not deal in comic printing services sold by their competitors. The litigation arises out of a claim filed with the Department of Justice on behalf of Atlantic Features that King Features was combining the licensing of its copyrighted features with the sale of the printing of the color comics in violation of the antitrust law.

After the complaint was filed, the defendant Hearst entered into a consent decree with the Department of Justice which in effect withdrew the charges against Hearst and provided that King Features may continue to engage in the practice of combining the sale of features and printing *until the court shall determine the antitrust issue as to Greater Buffalo*. The decree also provided that Hearst shall obey the antitrust laws during the pendency of the action. No reason has ever been presented by the Department of Justice to explain the significant change of heart toward the defendant Hearst. Any attempt by the court to explain the conduct would be inappropriate in view of the court's lack

of knowledge of the facts and circumstances surrounding that decision.

After the entry of the consent decree and prior to the taking of testimony, the government amended its original complaint by striking the allegation of monopoly against Greater Buffalo. There remain, therefore, conspiracy charges against NEA and Greater Buffalo under sections 1 and 2 of the Sherman Act, an alleged violation of section 7 against Greater Buffalo arising out of the International acquisition, and a violation of section 3 of the Clayton Act against NEA regarding tie-ins.

Greater Buffalo is a New York corporation with facilities in Buffalo and Batavia and is in the business of commercial printing, including color supplements and color comic supplements for insertion in newspapers, and is engaged in the production of goods for shipment in interstate commerce. Southwest Color Printing Corporation (hereinafter Southwest Color) is a Texas corporation, having its principal place of business in Lufkin, Texas. Dixie Color Printing Corporation (hereinafter Dixie Color) is an Alabama corporation with its principal place of business and facilities at Sylacauga, Alabama. Both Southwest Color and Dixie Color are wholly owned subsidiaries of Greater Buffalo.

International is a Pennsylvania corporation, having its principal place of business and facilities at Wilkes-Barre, Pennsylvania. Prior to June 1955, its sole business consisted of the printing of color comic supplements for the account of King Features Syndicate (hereinafter King), a division of Hearst. Greater Buffalo acquired all of the common capital stock on June 25, 1955, and since that time it has been engaged in the printing of color comic supplements for the account of King and both color comic supplements and commercial printing on contracts held by Greater Buffalo.

NEA is a Delaware corporation, with its principal place of business at Cleveland, Ohio, engaging in the business of licensing copyrighted newspaper features, including color comic features, to newspapers, and selling color comic supplement printing of copyrighted comic features to newspapers. Prior to 1955, NEA owned the stock of Buffalo Color Press, Inc. which owned and operated printing facilities in Buffalo, New York, and printed color comic supplements for NEA and one other newspaper. In 1955, its assets were sold to Greater Buffalo. Apart from its connection with Buffalo Color Press, NEA is not engaged in printing color comic supplements, but subcontracts such printing to other printers.

The Hearst Corporation is a Delaware Corporation with its principal place of business in the City of New York. It is engaged in the business of licensing copyrighted newspaper features, including color comic features, to newspapers through its New York division, King. It has also been engaged in the business of selling color comic supplement printing of copyrighted comic features to newspapers.

*The Industry.*

Color comic supplements are newsprint printed with colored ink containing reproductions of copyrighted color comic features, advertising material and other types of features. Each supplement page receives four impressions of ink which requires an exacting job of alignment and adjustment for each impression. A great deal of skill and expertise is necessary to be proficient in the printing of such supplements, and the higher the degree of skill, the finer the end product and more desirable the supplement in appearance and readability. Necessary to this process is the use of skilled personnel and stereotype equipment and other machinery.

Some newspapers print their own comic supplements. Many more are printed by color comic printing companies. The newspapers which do not print their own color comic supplements are capable of doing so but have found it to be to their economic advantage to

purchase them. There is every reason to believe that if at any time the cost of purchasing such color comic supplements exceeds the cost to the newspaper of printing them, the newspapers will do the printing themselves.

There are, therefore, three ways which a newspaper can obtain color comic supplements (hereinafter supplements):

1. Print its own supplements;

2. Contract directly with color comic printers; and

3. Contract with concerns which do not themselves print the supplements, but have arrangements with printers to print such supplements and deliver the same to newspapers.

Contemporaneously with contracting for the purchase of supplements, newspapers contract for the purchase of rights to the copyrighted comic features which appear in such supplements and, in general, the fees charged for the licensing of features are not pursuant to published price lists, but are arrived at after bargaining negotiations between the newspaper and the licensor. In attempting to obtain specific features, a newspaper is limited to those which are not already licensed under an exclusive arrangement with other newspapers in competition with it.[1]

For the past many years and continuing to this day, King has ruled the licensing portion of the color comic supplement industry. It controls the licensing of at least fifty copyrighted comic features, including the most popular comic features which are used by major metropolitan newspapers. Moreover, other features such as the writing of columns, which are essential to the circulation of large metropolitan newspapers, are controlled by King. Prior to 1955, King exercised dominant control over the printing of color supplements but since that time its position in the sale of printed supplements has been challenged by independent printers as well as syndicates.

Since approximately 1926, until very recently, Greater Buffalo has been owned, operated and controlled by Walter Koessler, now deceased, together with his brother Kenneth and other members of his family. The growth of the company has been financed entirely out of earnings derived from the business. During this entire period of time, the business has grown and become a model of efficiency in the industry. This is due to the fact that Mr. Koessler personally developed the mechanical techniques for the rebuilding of color printing presses, including the system of pre-registry, which resulted in greatly increased efficiency in the operation of such presses and improvement in the quality of the product at reduced cost in printing. Walter Koessler was a mechanical genius. The improvements developed by him in the printing of color comics, although not protected by patents, have not been duplicated by any manufacturer of printing presses or any other printers and because of this Greater Buffalo has alone been able to make great strides in improving color printing presses. As a result, Greater Buffalo has at all times enjoyed a distinct competitive advantage over other printers which is a result of the skill, diligence and efficiency of Walter Koessler and not the result of any illegal agreement or design to violate any provisions of federal law. The competitive advantage enjoyed by Greater Buffalo continues to this day. Greater Buffalo, as compared with King, has no

---

1. The court takes judicial notice of the fact that, after the closing of testimony in this case, the Department of Justice filed a complaint in the United States District Court for the Southern District of New York in an action entitled "United States of America v. The Hearst Corporation" No. 67 Civ. 4598, which charges the Hearst Corporation with a violation of section 1 of the Sherman Act in that for the past many years it has entered into contracts through its King Features Syndicate Division with newspapers for the exclusive licensing of the features within an arbitrary and unreasonably broad territory surrounding the newspaper's city of publication.

control over the ownership of features and has never engaged in their licensing. Consequently, it has never been in a position to offer the smaller newspaper a so-called "ready-print" supplement section, which is a preprinted supplement section supplied to many newspapers with only masthead changes, thereby sharing the printing among a number of newspapers which, because of the longer runs of this type of supplement, reduces to the individual newspaper the unit cost of such supplements. Both King and NEA are extensively engaged in this type of ready-print section. In recent years Greater Buffalo has obtained many contracts for the printing of color comic supplements solely by reason of its lower prices and the quality of its work. These contracts have come principally from newspapers previously engaged in printing their own supplements. The contracts provide for printing at uniform rates subject to cancellation by either party on ninety days' notice. They also provide that the transportation charges will be paid by the newspapers.

Prior to 1955 and to this day, all of the following companies, among others, have been and still are in competition with Greater Buffalo in the printing of color comic supplements, as well as the sale of such printing to newspapers and syndicates: Acme Color Printing Company, Eastern Color Printing Company, Star Color Printing Company, Southern Color Printing Company, World Color Printing Company. There has been no evidence presented to this court which would support a conclusion that Greater Buffalo controlled such a share of the market as would tend to create a monopoly or monopoly power. In recent years the color comic supplement industry has suffered from the competition of television; the substitution of other types of supplements, such as TV Topics, printed

by the newspapers themselves; and the discontinuance of the publication of large numbers of newspapers. It is not a growing industry. The discontinuance of newspapers has resulted in a surplus of printing facilities and equipment, and this, together with the existing facilities of modern newspaper plants adaptable to the printing of color comic supplements, has minimized the barriers to entry into the color comic supplement printing industry.

■ Examining all the testimony and the relations between the parties, the court finds that the significant lines of commerce involved in this action should be divided into two distinct and separate categories: (1) the printing of color comic supplements for newspapers which do not print their own, and (2) the printing of color comic supplements for syndicates engaged in the sale of copyrighted comic features to newspapers. These are the lines of commerce—to treat them together as one line of commerce, i. e., the printing and sale of color comic supplements, would be to ignore the tremendous leverage of the syndicates which control the copyrighted features. The testimony of Walter Koessler and other witnesses in this case has established firmly that the syndicates, and in particular King, have a unique position by virtue of the legal monopoly which they have over the copyrighted features. The court is of the opinion that the peculiar characteristics and business uses of copyrighted features justify considering printing for syndicates as a separate product market. See Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1961).

*The Charges of the Complaint.*

The evidence[2] indicates that Greater Buffalo and King engaged in active com-

<hr>

2. During this trial, the court reserved decision concerning the admissibility into evidence of certain documents offered on behalf of the government. In general, these documents are memoranda circulated between executives of King and, in

some cases, are personal memoranda of Mr. Nicht of King. Some of these documents have been offered on the theory that they embody statements of co-conspirators made in furtherance of and in the course of the conspiracy. Mindful

petition for the business of printing color comic supplements. Because of King's control over licensing of both comic and general features, Greater Buffalo has been at a disadvantage in meeting King's competition. In certain instances, such as the Waterloo, Iowa, incident, the power of King to withhold the licensing of comic features to newspapers, to which Greater Buffalo was supplying the color comic supplements, required Greater Buffalo to make weekly payments to King to satisfy demands of Nicht, the chief executive officer of King. These payments were not made as the result of any agreement between Greater Buffalo and King with respect to the division or allocation of business or customers. Moreover, in some instances the newspapers themselves decided to split contracts between King and Greater Buffalo because of transportation savings which could be realized. Specifically, this was done by the Gannett papers for the Utica and Binghamton papers. Evidence that a customer has elected to divide his business for economic reasons does not establish an agreement between King and Greater Buffalo to allocate customers between them.

Between 1955 and 1958, Nicht attempted to secure an agreement restricing competition between King and Greater Buffalo. Koessler, knowing King's dominant position and its power over Greater Buffalo's customers, led Nicht to believe that Greater Buffalo was willing to negotiate such an agreement but,

since Koessler was aware that such an agreement would be detrimental to Greater Buffalo, no agreement was ever reached with respect to monopolizing the printing and sale of color comic supplements, fixing prices, or allocating customers. Prior to 1955 and continuing to date, Greater Buffalo has competed with King and has obtained contracts from newspapers for printing formerly under contract with King and has been and still is in competition with NEA for the printing of color comic supplements. Greater Buffalo's competition with NEA has been restricted, since Greater Buffalo has not been and is not engaged in the sale of ready-print sections which is NEA's principal source of business. The acquisition of the assets of Buffalo Color Press, Inc., an NEA subsidiary, by Greater Buffalo in 1955 has not affected the competition between NEA and Greater Buffalo, nor has the contract between the two for the printing of color comic supplements by Greater Buffalo for the account of NEA. Moreover, during this time King and NEA engaged in competition for the licensing of color comic printing and color comic features and the printing of color comic supplements. Greater Buffalo, printing for both concerns, received complaints from each with respect to the competition of the other and attempted to mediate such complaints. However, at no time did Greater Buffalo enter into an agreement or understanding with either with respect to allocation of customers or solicitation of each other's accounts.

that there must be independent evidence that the alleged co-conspirator was a member of a conspiracy before statements in furtherance thereof are admissible, and viewing the evidence in the light most favorable to the government— and viewing only the government's evidence, the court finds sufficient evidence to infer the alleged membership in the conspiracy which warrants the allowance of these documents into evidence. Greater Buffalo strenuously objects to the admission into evidence of both the memoranda of Nicht to his superiors and his memoranda for his personal files. Since these memoranda in the main concern

events testified to by Koessler or verified as to substantial accuracy by Koessler, or in some instances concern subjects about which Greater Buffalo has offered similar exhibits (P–77–P–88) (Tr. pp. 1008–1010), the court admits those documents into evidence as being of some probative value concerning the state of mind of Nicht at the time the events took place. Cf. United States v. Corn Products Refining Co., 234 F. 964–978 (S.D. N.Y.1916), appeal dismissed on stipulation, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805 (1918). See also United States v. United Shoe Machinery Corp., 89 F.Supp. 349, 355 (D.C.Mass.1950).

Since Greater Buffalo's contracts with newspapers provided that transportation costs would be paid by the newspaper, Greater Buffalo has for many years attempted to locate and had made plans for the construction of printing plants in the deep south and southwest. This was both to accommodate its existing customers in those areas by providing lower unit cost per color comic supplement by cutting transportation costs and also to obtain new customers in these areas by providing a higher quality product at a lower unit cost. In furtherance of this policy, a printing plant was constructed in the early 1950's in Lufkin, Texas, by Southwest Color. The construction and operation of this plant was undertaken and financed entirely by Greater Buffalo, and its establishment has resulted in transportation savings to newspapers in the southwest. Some printing business subcontracted by King for printing at the Lufkin plant since 1958 has been done pursuant to an arrangement between King and Greater Buffalo on the same price schedules which are available to other customers of Greater Buffalo for Lufkin printing. The subcontracting by King affords an economic advantage to King and its customers and is not in any way dependent or contingent upon any overall agreement between King and Greater Buffalo. The operation of the Lufkin plant by Southwest Color under the direction and control of Greater Buffalo has not restrained competition in the color comic printing industry, nor has it disadvantaged any other company in the industry or tended to create a monopoly.

The establishment of a printing plant at Sylacauga by Dixie Color was in execution of plans made by Greater Buffalo in 1947 and a commitment made in 1950 to its customers in the area. Construction and operation of the plant were undertaken and financed entirely by Greater Buffalo without any contributions by any other company in the industry. The establishment of that plant has effected transportation savings to newspapers in the south and preserved competitive prices in the area over the period since its construction.

The printing business placed by King for printing at the Sylacauga plant since 1963 has been produced pursuant to an arrangement between King and Greater Buffalo on the same price schedules which are available to other customers of Greater Buffalo for Sylacauga printing and are entirely different than the price schedules that prevail for the printing of King Contracts at International. The printing business subcontract for printing at Sylacauga offers an economic advantage to King and its customers and is not in any way dependent upon any overall agreement between King and Greater Buffalo.

International had previously investigated construction of a plant at Sylacauga and had entered into negotiations with civic groups for a plant site and with the Coosa River Paper Company for a supply of newsprint, but it had never entered into any commitment to construct such a plant because it had no means of financing it. From the evidence it appears that the major stockholders of International were in no way desirous of investing further capital for the establishment of such an operation. The civic groups and the newsprint supplier were willing to transact business with any corporation prepared to finance and construct a plant. Although Greater Buffalo may have utilized to some degree the services of International officers after its acquisition of International, the funds advanced were from earnings generated by the innovations and improvements made by Greater Buffalo in the Wilkesbarre plant. The advances were repaid prior to the time any claim was made by the government that the Sylacauga plant was an asset of International. Construction and equipment of the Sylacauga plant were carried out at the direction of Greater Buffalo and were in no way dependent on the services of International or any of its officers or personnel. At the time its construction was undertaken, Greater Buffalo had contracts with newspapers

in that area, and its construction constituted a calculated business risk which Greater Buffalo alone was willing to undertake because of the supply of newsprint and the certainty of effecting transportation savings for Greater Buffalo newspapers in that area. The operation of that plant by Dixie Color has not restrained competition in the industry or tended to create a monopoly.

### The Acquisition of International.

Greater Buffalo and International have never been engaged in competition for the sale of color comic supplements to newspapers, since International has neither solicited nor held contracts with any newspapers. International's business was solely the printing of color comics for syndicates engaged in the sale of copyrighted comic features to newspapers. The acquisition by Greater Buffalo of International in 1955 was not the result of any agreement between King and Greater Buffalo and was neither suggested, aided or abetted by King or any of its officers or employees.

In 1955, at the time of its acquisition by Greater Buffalo, the resources of International were depleted to the extent that it had a deficit in working capital of $100,000. It had no means of securing financing for the construction of a southern printing plant and no means of modernizing its equipment. The owners of the corporation were anxious to sell the company and were continually demanding dividends in excess of the company's earnings. The owners were unwilling to invest capital toward expanding the operation of International or in any way investing in its development. The company's only customer (King) was placing some of its business with other printers, was threatening to take away more business, and was insisting on the construction of a substitute plant. The company's contract with King was cancellable on six months' notice, and it had been unable to negotiate a new long-term contract at rates sufficient to enable it to finance improvements to other facilities and the construction of a southern plant. The company's resources were so depleted, and the prospect of its rehabilitation was so remote, that it faced the grave probability of a business failure. No other person or corporation was interested in purchasing International which was a failing company. Indeed, prior to its acquisition by Greater Buffalo, International had been offered to King, but King refused to negotiate for the purchase of the company at any price. Under these circumstances, in the light of its unwillingness to enter into a long-term contract with International at increased rates, there was nothing King could do to impede or prevent the sale of International to Greater Buffalo.

The acquisition of International by Greater Buffalo in 1955, had no reasonable probability of substantially lessening competition in the color comic supplement industry because International had no share of the market of printing color comics for newspapers and its failing financial condition foreclosed the possibility of its obtaining a share of the market and competing with Greater Buffalo. The business of King was in no way dependent upon International, since King had access to the printing facilities of Hearst and the facilities of independent printers.

At the time Greater Buffalo purchased International, there was no agreement between King and Greater Buffalo or King and International for a long-term contract, and Greater Buffalo undertook the calculated business risk of operating International without such a contract in the belief that by the installation of its more efficient methods, it could effect savings in cost for International sufficient to attract the business of newspapers, as well as the syndicates, including King and NEA. Greater Buffalo did not acquire any additional share of the market of those engaged in printing color comics for newspapers which did not print their own by acquiring International.

Although, after the acquisition International negotiated a long-term contract with King at substantially the same rates that had prevailed in its previous contract, that contract was not conditioned upon the acquisition of International by Greater Buffalo. The contract was negotiated by Gorman with little or no direction by Greater Buffalo. The court finds that after the acquisition Greater Buffalo vastly improved the facilities of the International plant by installing its improved methods of color printing. As a consequence of the improved methods and engineering skills of Mr. Koessler, International has operated at a profit since the acquisition and is a healthy economic unit. The acquisition by Greater Buffalo of International and its operation by Greater Buffalo over the past fifteen years have not resulted in the lessening of competition in the color comic supplement industry and, in fact, competition between Greater Buffalo, King, NEA, Southern, Acme, Eastern and the other companies engaged in the industry, has increased. Indeed, from all the evidence, it appears that the companies across the country have benefited, and that competition prevails in the industry unfettered by any agreement by any of the principals in this case.

In short, the evidence fails to factually establish the violations charged against the defendants. What meagre evidence there is which points to alleged violations would, even if highly credited, be insufficient to warrant a court's exercising its discretion to order a divestiture fifteen years after the occurrence of the alleged illegal conduct.

*NEA and the Alleged Tie-Ins Claimed to Have Violated Section 3 of the Clayton Act.*

The government also charges that certain syndicates have illegally used the copyrighted comics by tying in the license to use the comics with the contract for printing the supplements. Newspaper Enterprise Association, Inc. is charged in paragraph 28 of the amended complaint with violating section 3 of the Clayton Act.[3] Although the court is of the opinion that, if proven, any agreement resulting in such a transaction as alleged would be a sale or contract for sale of goods or commodities encompassed within the purview of section 3, the court believes that the proof offered in this case would not support a finding of such an illegal tie-in.

The testimony and exhibits relied upon by the government in one portion of its tie-in proof, namely P–142 through P–146 and P–152 and P–153, concern negotiations which did not result in contracts with NEA for ready-print. Therefore, any price differentials which may have been reflected during these negotiations could not support a finding of a violation of section 3, but could only be used as corroborating other evidence of tie-ins. United States v. Loew's, Inc., 189 F.Supp. 373, 380 (S.D.N.Y.1960), modified on other grounds, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Furthermore, exhibits P–149, 150 and 151 are evidence that NEA on one occasion re-

---

3. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of godds, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14 (1914).

duced the price of the ready-print to a publisher who subscribed to its intermediate service, showing only that if a tie-in existed, it would be of printing to the intermediate service—not to copyrighted comic features. Other proof indicated that NEA refused Mr. Hornady permission to sell NEA comics as its agent because he was the representative of three of NEA's competitors, a decision which seems eminently sensible. The government also points to a situation wherein NEA "threw in Oop" to meet competition on its contract with Ponca Oklahoma City News. Although a consummate transaction, the government failed to prove that this had a conditioning effect, and the evidence shows that Oop (Alley Oop) was already included in its make-ready. Its effect was beneficial to both the newspaper and NEA. Moreover, the evidence on all of the transactions offered in support of the tie-in charges indicates that price differentials which may exist are legitimately justified by cost considerations. In reaching this conclusion, the court has closely examined the proof concerning the ready-print process. The inclusion in ready-print of certain comics selected by NEA, which can be sold as a unit to many newspapers throughout the country, results in a spreading of fixed costs overall to newspaper customers and an economic advantage to NEA of a lower unit price than could be charged profitably if each supplement was printed separately for each newspaper. The court has also considered evidence tending to show that if any newspaper decides not to buy the printing from NEA but wants any NEA comics, those comics are sold to the newspaper at the fair market price. Since a newspaper, in purchasing the ready-print, is limited to those features which NEA has previously selected and included in the ready-print, the price differential is justified by cost considerations and benefits to both the newspaper and NEA. The court, therefore, finds that the government has failed to prove the violation of section 3 of the Clayton Act regarding Newspaper Enterprise Association, Inc. regarding alleged tie-ins.[4]

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action between the parties.

2. Greater Buffalo and NEA have not engaged in any competition and con-

---

4. This is not to conclude that the tie-in practice is not engaged in by certain syndicates controlling the licensing of color comics. The testimony at the trial of Mr. Koessler and others indicates that King Features had for a long period of time engaged in tie-in practices, and that such tie-ins seriously affected competition between Greater Buffalo and King. In fairness, it should be pointed out that King Features was not represented by counsel during these proceedings, did not cross-examine any witnesses regarding King's alleged tie-in practices, did not present evidence on its own behalf, or in any way take part in the trial, having previously agreed to a consent decree entered on the 31st day of August 1965. The terms of that decree provided in part: "V(B). Notwithstanding the making and entry of this final judgment, the plaintiff may, *if the court adjudicates that the defendant, Greater Buffalo, has violated any of the antitrust laws as charged in the . complaint filed herein*, seek, and the court may order, such other relief as to the consenting defendant as the court may deem necessary and appropriate to dissipate the effects of the unlawful activities that may be found by the court, and to permit and restore competition in interstate trade and commerce in the printing and sale of color comic supplements * * *" [Emphasis added.] Since the court, as outlined in this memorandum, has not found the defendant Greater Buffalo violated any of the antitrust laws as charged, the court has no power under the terms of the judgment entered August 31, 1965, to enjoin the defendant Hearst from engaging in any tie-in practice which may be revealed by the evidence.

spiracy with Hearst or each other or any other person or corporation to refrain from soliciting color comic supplement business from one another's customers and to maintain and stabilize the price of color comic supplement printing in the United States.

3. Greater Buffalo and NEA have not violated section 1 of the Sherman Act as charged in the complaint.

4. Greater Buffalo and NEA have not engaged in any competition or conspiracy with King or each other or any other person or corporation to monopolize trade and commerce in the color comic supplement industry.

5. Greater Buffalo and NEA have not violated section 2 of the Sherman Act as charged in the complaint.

█ 6. The acquisition by Greater Buffalo of International has not resulted and will not in the future result in a substantial lessening of competition or tendency to create a monopoly with respect to the color comic supplement industry, and such acquisition by Greater Buffalo did not constitute a violation of section 7 of the Clayton Act.

█ 7. NEA has not sold comic features to newspapers at discounts, rebates or reduced prices on the condition, agreement or understanding that such newspaper purchasers shall not deal in the color comic printing services offered or sold by any competitor or competitors.

8. NEA has not violated section 3 of the Clayton Act as charged in the complaint.

9. The defendants, Greater Buffalo Press, Inc., International Color Printing Corporation, Southwest Color Printing Corporation, Dixie Color Printing Corporation and Newspaper Enterprise Association, Inc. are entitled to a judgment dismissing the complaint.

Enter judgment accordingly.